## JUZAN, ET AL. V. TOULMIN.

1. If one person makes a representation to another, who is about dealing with him, upon the faith thereof, he shall make it good if he knew it to be false; but to induce a court of equity to interfere, in such a case, it must be shown that the misrepresentation was in a matter important to the interests of the other party, and that it actually did mislead him. And the same consequences follow a misrepresentation, if the party made the assertion recklessly, without knowing whether it was true or false, or even innocently, if it operated as a surprise. But a misrepresentation in a matter of opinion and fact, open to the inquiries of both parties, and in respect to which neither can be presumed to have trusted the other; unless there be fraud, in cases of peculiar relationship or confidence, or where the other party has justly reposed upon it, and been mislead, furnishes no ground for relief.

2. To constitute a case of *suppressio veri*, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate, and in respect to which he cannot be innocently silent.

3. Where there is a peculiar relation of a confidential and fiduciary character, which gives to one of the parties an undue advantage over the other, the law requires the utmost degree of good faith in all transactions between them; consequently any misrepresentation or concealment of a material fact, or just suspicion of artifice, or undue influence, will induce the interposition of equity, and the vacation of any transaction between the parties, under such circumstances.

4. A contract made by a man of fair understanding, would not be set aside merely because it was a rash, improvident or hard bargain; yet if made with a person of imbecile mind, the inference is, that it was obtained by circumlocution or undue influence, so as to throw upon the other party the *onus* of showing its fairness.

5. Mere inadequacy of price, or other inequality in the bargain, will not induce a court of equity to avoid it, unless it be such as to shock the conscience, and amount in itself to conclusive and decisive evidence of fraud.

6. *Semble,* where all the complainants are interested in the principal matter stated in the bill, but the bill states a distinct ground for the interference of equity, which concerns only one of the complainants, if there is no prayer for relief touching this latter matter, the bill is not multifarious.

7. The testimony of one whose name appears as a subscribing witness to a deed executed about twelve years previously, that ho had ne recollection of ever having seen and attested the deed, and believes he never did, is not sufficient to show the deed to be spurious, in opposition to one witness who testifies to its execution by the parties, and of others who state corroborating facts.

8. Parties and persons interested are competent witnesses in respect to the facts and circumstances necessary to lay a foundation for secondary evidence of a writing, as that a search has been made, and it cannot be found.

9. The proof necessary to establish the loss of a writing, so as to let in secondary evidence of its contents, must depend upon the nature of the transaction to which it relates, its apparent value, and other circumstances. If suspicion hangs over the instrument, or that it is designedly withheld, a rigid inquiry should be made into the reasons of its non-production; but if there is no such suspicion, all that ought to be required, is reasonable diligence to obtain the original—in respect to which the courts extend great liberality.

10. *Semble;* the staleness of the complainant's demand will sometimes induce a court of equity to deny relief, although the statute of limitations may not have completed a bar.

11. Although a contract is entered into under a mistake of law, or fact, yet if it was made in good faith—each party possessing equal information, or equal means of acquiring knowledge, neither having practised any unfairness or deception towards the other, a court of equity will not grant relief.

Appeal from the Court of Chancery sitting at Mobile.

The plaintiffs in error, Peirre Juzan, John B. Juzan, and Gertrude C. the wife of the latter, exhibited their bill against the defendant; the allegations of which, so far as material to the understanding of the cause, may be thus condensed.

In 1795, Daniel Juzan and Louisa Laurendine, the father and mother of the complainants, Peirre and John B. intermarried in the vicinity of Mobile, then part of the province of West Florida, and under the dominion of the King of Spain.

About the time of this marriage, Baptiste Laurendine, the father of Louisa, conveyed to the father and mother of the the complainants, a tract of land, since known as the "St. Louis" tract, containing about two thousand acres. This land is particularly described in the bill, appears to lie on the west side of Mobile river, and within a short distance of the city. The conveyance was made according to the forms of the Spanish law, and provided that the land should be held by the grantees, during their joint lives, then by the survivor until his or her death ; afterwards in fee simple to the children of the marriage. These children were the two male complainants, Louisa J., now the widow of Henry Gunnison, and Ament, the wife of the defendant.

Soon after the conveyance was thus made, the grantees removed upon the land, and continued their residence there for thirty years, and more, and until their death, respectively. The Spanish civil law, independently of the terms of the deed, inhibited a conveyance by the husband and secured the inheritance to the children ; yet Daniel Juzan fell into the common error, that after the possession of the country west of the Perdido, was taken by the United States, in 1813, that marital rights to property originating previously, though created by contract, were tacitly abrogated, and the husband became invested with an unincumbered title.

In September, 1815, D. Juzan executed a deed by which he divided his property amongst his children ; to Peirre, he conveyed one hundred and sixty acres, including the family residence on the " St. Louis" tract, and known as the " White House." The donee was then but fifteen years of age, though older than his brother and sisters—knew nothing of this deed until a short time previous to the commencement of this suit—refers to it as recorded in the Mobile County Court, and exhibits a copy.

On the 22d April, 1816, Daniel Juzan conveyed the entire tract to David Files, in consideration of $3,900, and took from him a mortgage, bearing the same date, to secure the payment of the purchase money. By a written agreement between Files and his vendor, the latter was to retain the possession of his residence and the contiguous lands until he

was fully paid. The deed and mortgage are both exhibited.

Files, after having paid about $2100 to Juzan, died, in the year 1820, and administration of his estate was committed to Jeremiah Austill, by the County Court of Monroe, who reported the estate insolvent, and prayed an order for the sale of the lands of the intestate, including the tract in question. A decree was accordingly rendered, directing the sale of the " St. Louis" tract, and commissioners appointed to execute it; at that sale, the defendant became the purchaser, at the sum of eight hundred dollars, and received a deed, which is exhibited.

Although their sisters were educated by an aunt, after the death of their mother, the complainants were brought up in ignorance—Peirre can with difficulty read plain print, and write his name mechanically; John B. can neither read or write.

Defendant was well educated, and when he grew to manhood took high rank in society for intelligence and gentlemanly bearing. When he married their sister, complainants confided in him to an unlimited extent, and looked up to him for counsel and advice.

D. Juzan was dead several years before the sale above stated, under the decree of the Orphans' Court; and it was agreed between the defendant and Austill, that the former should pay the children of the mortgagee what was due on the mortgage, for principal and interest. After the purchase by the defendant, he came to see the complainants, remarking that he had a complete title to the land, and that they were entitled to a part of the mortgage money—offered to give them in lieu of their interest $100 and twelve acres of land, each, so as to include the old homestead of their father. Complainants were attached to the place, and confiding in the justice of the defendant, accepted his offer.

John B. sold the land assigned to him to G. W. Owen, and a deed was made by the defendant to his vendee. No deed has ever been made to Peirre for the part allotted to him ; defendant has put him off from time to time, saying it was inconvenient, &c.; but when informed that this suit was about to be brought, expressed his readiness to make a title.

84

Up to September, 1831, defendant sold parts of the land to different purchasers for large sums of money; about that time, or a little previous, he discovered for the first time, the marriage settlement above recited, written in the Spanish language, and caused it to be translated into English. The original cannot be found, unless it is in the defendant's possession, and thereupon he is called upon to exhibit it.

There is registered in the county court of Mobile a deed purporting to have been executed by the complainants, and Henry Gunnison and Louisa his wife, on the 24th September, 1831, by which the grantors convey to the defendant the "St. Louis" tract of land, in consideration of $1500 paid to them. Now, although this deed is attested by two witnesses, acknowledged and recorded in due form, the complainants have no recollection of ever having executed it, or any other conveyance for the lands embraced by it, and therefore deny that it is genuine. Complainants intended, about the time referred to, to have executed a quit claim deed in favor of Philip McLoskey, and if the deed thus recorded was ever executed by them, they affirm that it was under the impression, induced by the defendant's representation, that it was another instrument, which they were willing to sign.

Complainants deny that they ever contracted with the defendant for land, except the two twelve acre lots which they agreed to receive in payment of the amount due them on the mortgage from Files. *Further;* they never acknowledged the deed of September, 1831, and call for the production of the original.

The bill concludes with a prayer, that the deed last referred to, may be delivered up by the defendant and cancelled; that the defendant may be required to present a full account of all sales he has made of parts of the land; that he may be required to pay over to complainants their share of all the monies received, or to be received on account of such sales, and execute to them good and sufficient titles to one half of so much of the "St. Louis" tract as remains unsold. Also, that such further relief may be granted as may be equitable and proper.

The defendant answered the bill at length, admitting the

marriage of the complainant's father and mother, in 1795, the death of the latter in 1812, and the former in 1825, leaving the four children mentioned in the bill; that the "St. Louis" tract was possessed and claimed by John Baptiste Laurendine, senior, the father of the complainant's mother.

In 1799, the grandfather made a will, distributing his real and personal estate among his children, appointed his son, John Baptiste Laurendine his sole executor, and died the same year, leaving six children, viz: his executor, Harry, Peter, Edward, Barbary, and Victor. In 1808, the executor of the elder Laurendine, applied to Antonio Salazor, commandant residing at Mobile, for a sale and division of all the estate of the testator, and an order was granted accordingly. The real and personal estate of the testator, on the 30th June, 1808, in obedience to the order, was offered at public sale, and the father of the complainants, among other things, purchased the "St. Louis" tract for $500.

It is admitted that D. Juzan concluded to give his property to his children, and on 3d September, 1815, executed a deed to the complainant, Peirre, for one hundred and sixty acres of land, including his dwelling, and distributed the residue of his estate amongst his other children. The sale to Files is admitted, as alledged, as also the execution of the mortgage to secure $3,400, the balance of the purchase money unpaid; but defendant is ignorant of any agreement between the mortgagor and mortgagee, that the latter should retain the possession.

In 1816, David Files filed a bill against Daniel Juzan and his son Peirre, to vacate the deed to the latter, and a decree was accordingly rendered, declaring the same to be void, and vesting the title in the complainant in that suit. On the 20th October, 1820, Files died intestate; Austill was appointed his administrator by the County Court of Monroe, and on his application a decree was rendered, requiring the sale of the real estate in question, upon the ground that the personal property was insufficient to pay the debts. Accordingly the same was sold by commissioners appointed for that purpose, on the first Monday in June, 1825, and the defendant became the purchaser for $855—the sale was confirmed, the purchase money paid, and a deed duly executed.

Files paid upon his purchase, of principal and interest, about $2,000, at different times, leaving a large balance unsatisfied. Defendant denies that he made any agreement with Austill, or assumed any obligation not arising out of the condition of the purchase and the character of the mortgage. In addition to the amount paid by the defendant to the administrator of Files, and what was due on the mortgage, the defendant paid F. W. Armstrong more than two thousand dollars for a lease which Daniel Juzan had made of the land, with the privilege of making brick, and cutting wood thereon.

After the defendant's purchase, he proposed to the children of D. Juzan, to contribute their proportion, and come in and hold the land in equal shares of one quarter each. Gunnison, in right of his wife, accepted the proposition, and at his request, a deed was executed to William R. Hallett, as agent of Robert Wilson, in payment, or as security for money borrowed of the latter.' The complainants declined to come into the arrangement, saying that they only wanted a few acres, embracing the " White House ;" thereupon the defendant agreed to convey to Peirre and John B. twelve and a half acres each, including the residence of their father, and to pay each of them 125 or $150, the precise sum not recollected, in full of all claim under the mortgage, and to the land.

Defendant has always been willing to execute a deed to Peirre for his twelve and a half acres, and the only time he ever asked for a deed, the defendant requested him to call at his house, and he would draw it up and execute it. John B. sold his land to G. W. Owen, or A. S. Lipscombe, in 1825, and requested the defendant to make a deed to the purchaser, which, if he has not done, he is willing to do.

The deed executed on the 24th September, 1831, by Gunnison and wife, and the complainants, was obtained under the advice of counsel, as the easiest mode of carrying into effect the previous contract of the parties. It is in form a quit claim of all the grantors to the defendant—was executed on the day of its date, in the presence of the witnesses who attested it, and was acknowledged before James G. Lyon, clerk of the Circuit Court of Mobile.

In November, 1831, Files' heirs, and Thomas Johnston

Juzan, et al. v. Toulmin.

supposing that they had a better title than the defendant, under a pretended contract with D. Juzan, filed a bill in Chancery against the heirs of the latter. The defendant employed counsel and defended the suit, but the complainants took no interest in the matter—regarding themselves as mere formal parties. To enable his counsel, the late John Elliott, to prepare his answer to the bill, and make defence to the same, the defendant thinks he handed him the deed which he received in 1828, from the commissioners who executed the decree of the Orphans' Court, as also the deed of September, 1831. He has not had these deeds in his possession since he filed his answer in that case—none of the papers pertaining to that suit are to be found in the file, or elsewhere within his knowledge. After the most diligent and thorough search the deed of 1831, cannot be found among Mr. Elliott's papers, or in the Circuit Court, or Court of Chancery. The defendant affirms, that that deed was the only one ever executed by D. Juzan's heirs, save a deed which they made in December, 1830, upon compromising a dispute with McLoskey, in respect to some lot in Mobile, of which the latter was in possession.

No marriage settlement, of which the defendant is informed, was ever executed by the elder Laurendine. In 1832, the late Samuel Acre handed to the defendant a paper written in the French language, together with another belonging to the Chostang family. The first named paper Mr. A. said was an agreement between D. Juzan and wife, in contemplation of their subsequent marriage, to make common stock of all they had, subject to the control of the husband, and final disposition of the survivor. Mr. A. and Mr. Elliott both concurred in the opinion that it was of no effect—this conclusion the defendant then and still believes, was correct. On the same day on which Mr. A. handed the defendant the paper, the latter thinks he informed Peirre what Mr. A. said; and afterwards gave the same information to John B. He has never misrepresented the character of that paper, and has it now ready to produce. It did not restrict the right of D. Juzan to alien the land, and consequently does not avoid the sale to Files; but is the only instrument of which the de-

fendant has any knowledge, which bears any resemblance to what complainants in their bill call a "marriage contract."

The defendant insists, that the "St. Louis" tract, including what he paid to Armstrong for the lease, cost him quite as much as it would have sold for in 1825, or several years afterwards; that the offer to Juzan's heirs was made in good faith, and rejected by them with a knowledge of facts necessary to have enabled them to form an opinion. He denies all misrepresentation or fraudulent concealment, or that complainants, or any one else, ever executed a deed in his favor, without understanding its import. Admits that complainants and defendant have been on friendly terms; that they had confidence in him, &c.—he assisted them willingly, and they are now really indebted to him for money lent them. Admits that he sold parts of the "St. Louis" tract, both previous and subsequent to 1831, but submits to the court that he should not be required to exhibit an account until it should be determined that the complainants are entitled to the relief they seek.

The complainants never (that the defendant heard,) expressed dissatisfaction with the deed of September, 1831, or the contract that led to it, until a few weeks before the commencement of this suit; and their dissatisfaction it is believed was produced by the interference of others. In his answer, the defendant prays the benefit of a demurrer.

Upon the coming in of the answer, the complainants, by leave first obtained, filed an amended bill, in which it is alledged that the elder Laurendine, and his wife Louisa, made their respective wills; by which each bequeathed and devised to the other, one half of his or her estate, and the other half to their children. Previous to the 7th June, 1808, the testator and testatrix died, leaving their son John B. Laurendine jr. sole executor. On that day the executor applied to Salazar, the Spanish commandant at Mobile, to appoint guardians to the minor children of the testator and testatrix, that he might, under their respective wills, make an inventory and division of the estate; the application was granted, and the executor appointed the guardian. Accordingly, on the 27th of the same month, the executor, in the presence of several persons of Mobile, proceeded to make an extra-judi-

cial inventory and appraisement of the estates in conformity
to the provisions of the will : that although the " St Louis"
tract had been given to the complainant's mother on her mar-
riage, yet it was brought into the " inventory and appraise-
ment" as part of the estate of the testator or testatrix, and
disposed of as the other property.   Whether this was done
according to the Spanish laws to entitle the complainants
" to obtain a portion of the remainder of the property," com-
plainants are wholly uninformed.   The complainants' mo-
ther received upon the division as follows, viz : the " St.
Louis" tract valued at $500 ; one negro woman at $310 ;
24 head of cattle at $138 ; and paid to the executor $220,
and some cents, so as to equalize the shares of the legatees.
It is insisted that the share thus allotted to their mother be-
came her separate estate, and descended to her children, un-
impaired by any sale or transfer of D. Juzan.   As an excuse
for not alledging these matters in the original bill, it is said
that the complainants were only informed of them by the
answer.

The answer to the amended bill admits that the wills and
proceedings by the executor are correctly narrated.   Denies
that there was any settlement of the " St. Louis" tract up-
on Mrs. Juzan, affirms that it was rightly appraised and brought
into the division.

It is denied that there was any agreement that the land
should be the separate estate of the complainants' mother.
The sale was public—all persons were authorized to bid, and
other persons, as well as Laurendine's heirs, did buy proper-
ty.   D. Juzan's purchase, and the cash payment made by him
to the executor, vested in him a complete title to the land in
question, and authorised him to sell it at pleasure.

Upon exception taken to the sufficiency of the answer, the
defendant answered further, stating that he did believe when
he purchased the estate at the commissioners' sale, that he
acquired a complete title, subject to the payment of the sum
due upon the mortgage by Files to Juzan.   By a calculation
made when it was proposed to settle with the complainant's
further interest under the mortgage, it was ascertained that
twelve or fifteen hundred dollars was due them ; but they
said they only wanted twenty-five acres of land.  Complainants

and defendant differed some twenty-five or fifty dollars, as to the amount claimed by the former to make up with their land, what they considered an equivalent for their share of what was due on the mortgage, and it was finally agreed that they should have two hundred and fifty dollars. The defendant then and still considers that sum of money, and the twenty-five acres assigned the complainants a fair equivalent for the complainants' claim—that part of the land was regarded most desirable in point of location ; besides it embraced all the original improvements made on the tract.

Defendant cannot speak positively as to the circumstances attending the execution of the deed, but his best recollection is that the complainants executed it at his house—thinks the name of John B. Juzan was written at his request by James G. Lyon—believes Lyon and Gilbert C. Russell were both present—that the deed was prepared by the former and taken to the house of Gunnison, one and a half miles from the defendant's home, where Gunnison and his wife executed it. Defendant cannot recollect whether the probate of the deed was made at the time and place of its execution ; but the whole matter must have transpired in a short time, as the deed purports to have been made on the day of its execution, and received in the office of the clerk of the county court two days thereafter, for registration. The writings referred to in the pleadings, are exhibited by the respective parties, or alledged to be lost.

Much testimony was taken, as well by the complainants as the defendant, but it is not necessary here to recite it, as it is sufficiently noticed in the arguments of counsel, and in the opinions of the court.

The decree rendered upon the hearing of the cause, presents the following points, viz :

1. The complainant objected to the testimony taken at the instance of the defendant, which merely proves his good character ; the decision of the question being regarded so unimportant, was waived by the court.

2. Charles D. Godbold, a witness for the defendant, testified that Gilbert C. Russell, whose deposition had been taken at the complainants' instance, informed him that he was interested in the plaintiff's success in this suit ; complainants

objected to this testimony of Godbold, because the inquiry should first have been made of Russell, whether he made such a statement to the witness. This objection was sustained.

James G. Lyon's deposition was taken at the complainant's instance, and afterwards by the defendant ; the complainants moved to exclude the latter, upon the allegation that it contradicted the first, and the inconsistency should be explained. The chancellor was of opinion that the depositions were consistent with each other—true the last was more full, but this was satisfactorily accounted for ; and therefore overruled the motion to suppress.

4. The defendant's answer, it was agreed, should be received as an affidavit of the loss of the deed of September, 1831, yet it was insisted that its loss was not sufficiently accounted for, and the testimony to prove its contents should be rejected as secondary. This objection was overruled.

5. It was objected that the decree rendered in 1816, at the instance of David Files, setting aside the deed from D. Juzan to the complainant, Peirre, was inadmissible, because there was no bill or other papers on file in such a cause. The chancellor thought that the existence and loss of such papers might be shown by parol testimony ; and that the evidence of the Hon. William Crawford, that such a suit was commenced and prosecuted by him as counsel, up to the rendition of the decree ; together with a copy of the decree certified by the register to be a complete transcript of all the papers in the cause, was sufficient proof to the point.

Touching the merits of the case, it was adjudged,

1. That the marriage settlement alledged in the bill has not been established by proof.

2. That the settlement which the answer describes as translated from the Spanish language, if available, is not attempted to be set up by the complainants, and must therefore be placed out of view.

3. The property, at least the real estate purchased by D. Juzan in 1808, at the sale under his father-in-law's will, vested in his wife, and at her death was transmitted to her children, subject only to the curtesy of the husband.

4. Although the sale from D. Juzan to Files may not have

85

passed the fee, yet the purchase by the defendant at the commissioners' sale ; the purchase of Armstrong's lease, and his offer to Gunnison and the complainants to contribute equal portions to reimburse his advances, and participate in the purchase ; the acceptance of the offer by Gunnison, of small parcels of the land and money by the complainants, in full for their interest ; and the consummation of the arrangement by the deed of September of 1831, were decisive, unless successfully impugned, to establish the defendant's title to the property in question.

5. That the secondary evidence supports not only that deed, but the conveyance by the commissioners under authority of the orphans' court.

6. It is concluded that the deed of 1831 was not obtained either by fraudulent representation or concealment. If it had been a forgery, it is not probable that it would have been placed upon record immediately after it bears date—the testimony of Russell, that he don't recollect to have ever seen or attested the deed, can't outweigh the positive and responsive answer of the defendant—the depositions of Lyon, Mrs. Gunnison, and others, and the fact that the copy upon the registry bears evidence of having been duly acknowledged.

7. The objection that the deed is not supported by an adequate consideration, is not well taken—the removal of incumbrances, disembarrassing of the title, and the purchase of a right which the most eminent counsel regarded as doubtful, all constitute an adequate consideration.

8. Although the complainants may have been persons of but little information, subject to the defendant's influence, there is no evidence of abused confidence. The division and sale of the estate of the grand-father, Lauredine, the marriage settlement (if any) were alike accessible to all. There was at most, nothing more than a mere mistake as to the facts on the part both of complainants and defendant, against which Equity will not relieve.

9. Lapse of time since since complainants' rights accrued, without any proof that the defendant attempted to keep them in ignorance, is a barrier to relief in equity—they have not only not complained, but have sanctioned the defendant's title, and must now yield to it. The statute of limitations

might be successfully pleaded to an action at law, to try the title, and by an ology, operates a bar in equity.

It was accordingly decreed that upon the defendant's executing deeds before the register, pursuant to the agreement between the complainants and himself, for twenty-five acres of ground, then the bill be dismissed, and each party pay his own costs.

J. GAYLE, for the plaintiffs in error, insisted, that the title to the land in question vested in the heirs of Daniel Juzan, upon the death of their mother, and Files acquired nothing more than an estate for the life of his vendor.

Mrs. Juzan acquired the land under the will of her father, and its destination was controlled by the Spanish law, in force in the province of West Florida, in 1808, when she received it. By that law, the property which a wife brings to her husband in marriage, is called *dowry*; what the husband brings is called *arras*, or in Latin, *donatio propter nuptias*. [1 Partida's, 507-8 ; Civil Code, Art. 2317-8.] Although the husband may control these donations for the maintenance of himself, his wife and family, yet he cannot sell or alien them. [1 Partidas, 514; Civ. Art. 2337 to 2342.]

The *paraphernalia* of the wife, though it constitute no part of her dowry, is her separate estate, subject to her control only, and the property of the husband is bound, as if by mortgage, for its restitution. [Civil Code, Art. 315.]

A contract at or before marriage, that the survivor shall succeed to the property brought in by each, cannot be executed if there are children—in such case the survivor will only be entitled to a life estate. [Partidas, 530, 531. The *dowry* and *paraphernalia* upon the death of the wife, descend to her heirs; if they are children, and under age, the father or mother may retain them for their support: but it can neither be sold nor dissipated. [Partidas, 540-1 ; Civ. C. Art. 2353.]

So the property of married persons is also considered as common, or separate. The latter is what either party brings into marriage, or acquires during its continuance, by inheritance or donation; while common property is the acquisition of the husband in any other manner, during the continuance of the matrimonial connection. [Civil Code, Art. 2314.] Where lands are purchased with dotal funds, they retain the

character of the money they represent. [Civil Code, Art. 2336.]

These authorities show, that the land received by D. Juzan, upon the division of the estate of his wife's father, whether bid in at public sale, or not, was her property, and could not be aliened by him, so as to defeat the right of his wife's children. But the Spanish law, as it respects real estate, is not materially different from our own; and whether the rule of decision be furnished by the one or the other, the result will be the same. ]1 Johns. Ch. Rep. 450; 2 Story's Eq. 456, § 1210.]

One who purchases from an agent, or of a person who professes to sell under a power, acquires no title, if there was no authority·to sell. [4 Wend. Rep. 474.] And a purchaser with the knowledge of a trust, or an equity, is chargeable with notice, and stands in the situation of his vendor. [1 Johns. Ch. Rep. 557, 566; 1 A. K, Marsh. Rep. [165.] A purchaser who would avail himself of a want of notice, must explicitly and positively deny notice, though it is not charged in the bill. [1 Johns. Ch. Rep. 302; 7 Id. 65; 8 Cow. Rep. 361; 1 Hop. Rep. 48.] He must also be a complete purchaser, that is, must have paid the money and obtained a conveyance. [1 Johns. Rep. 64, 67; 5 Litt. Rep. 62; 7 Monr. Rep. 599; 3 Leigh's Rep. 426.] Now although the complainants may have assented to the defendant's purchase at the sale under the decree of the Orphans' Court, they are not estopped from setting up a paramount title in themselves and showing that the concession made by them, in acknowledgment of his title, proceeded from a misapprehension of their rights. [7 Johns. Rep. 157; 7 Cow. Rep. 637; 7 Wend. Rep. 401.]

If, however, the title was in D. Juzan, the conveyance to his son of a part of the land, transferred a title to the donee, *pro tanto*, and the decree rendered in 1816, by which that deed was set aside, is of no validity; and must, in the condition of the record, be treated as a nullity. [Gresly's Eq. Ev. 109, 319; 1 Phil. Ev. 396, 398; Com. Dig. p. 85.]

It is insisted that the deed of 1831, which the defendant sets up as a renunciation of the complainants' right to the land in controversy, was never executed, or if it was, the

execution of it by the complainants was induced by the fraud of the defendant. The registration of the deed, was nothing more than *prima facie* evidence that it was regularly proved and recorded; but this presumption was repelled by the testimony of Russell and Lyon in their depositions for the complainants, and the genuineness of the deed should be established by other and independent evidence. [4 Johns. Rep. 161; 3 Johns. Cases, 234.]

Where a deed has been lost or destroyed, it should be shown that a diligent search has been made for it in the place where it was likely to be found, or the loss or destruction should be shown by positive proof. [1 Stark. Ev. 386, n. 2 ed. 7.] If the party to whose possession it was traced is dead, application should be made to his representatives, and a search made amongst his papers, and some one who has charge of them, examined. [Id. ; Greenl. Ev. 595; 3 Phil. Ev. 1227; 16 Johns. Rep. 193.] Not only should it be shown that the proper means have been used to recover a paper, but its contents should be proved by satisfactory evidence. [Id. 593.] If there is reason to believe that the instrument is designedly withheld, or its production would prejudice the party who claims a benefit from it, in the one case, secondary evidence should not be admitted, in the other, the most convincing proof of loss should be required. [3 Phil. Ev. C. & H.'s Notes, 1222-3-4.] None of these requisitions have been complied with in the present case.

It may be fairly presumed, that the deed has been designedly withheld. There was no reason why it should have been placed in the hands of Elliott, to enable him to defend the suit of Johnston and Files' heirs against the defendant, and the complainants. The bill shows that it could not have afforded any aid in the defence. It is somewhat remarkable, that every paper that could be of service to the defendant, if the statements in his answer are true, and if untrue, would have been available for the complainants, are said to be lost. The deposition of Chastang shows, that the deed of 1831, was in defendant's possession after the commencement of this suit, and there can be no doubt but its loss is a mere pretence.

The deed of 1831 is not proved. Lyon does not state

that it was acknowledged before him, and Russell avers that he never attested it. Mrs. Gunnison does not speak from her own knowledge of its execution; for she says that the complainants were not present when she signed it. But if the genuineness of the deed was conceded, then it is insisted that it is not supported by a sufficient consideration. The testimony of Newbold and Russell shows that the land was worth from $5,000 to $20,000, in 1825, and the value of the twenty-five acres was $750—not more than one half their interest in the sum due them from Files' estate, if the sale made by their father had been obligatory upon them; and not above one-tenth their interest in the St. Louis tract. The answer of the defendant is irresponsive to the bill as it respects the complainants' interest, its value, and the offers he made to them. [Ala. Rep. 333.] The transaction is one of gross inadequacy of consideration, and must for that reason fail. [3 Wend. Rep. 626.]

The defendant supposed that his title to the land was complete, by his purchase under the decree of the Orphans' Court of Monroe, and the payment of what was due on the mortgage of Files to Daniel Juzan. This is indicated by the fact, that he never applied for a conveyance, or quit-claim from the heirs of Daniel Juzan earlier than 1831, though he previously sold parts of the land to different persons; by the amended answer, which sets up no other contract than that in respect to the extinguishment of the mortgage; as well as by the additional fact, that it is not pretended that Gunnison made an agreement for the adjustment of his interest previous to 1831. See R. G. Gordon's deposition as to Elliott's opinion of Daniel Juzan's title.

E. S. DARGAN and P. PHILLIPS, for defendant. The demurrer to the bill should have been sustained, because it sets up two titles—one in favor of the complainants and their sisters, and the other vesting an exclusive interest in Peirre Juzan under a deed made by his father in September, 1815. To enforce the latter, but one of the complainants could sue, and the misjoinder is fatal. [Story's Eq. Pl. 392; 8 Peters' Rep. 123.]

Although the original bill supposes that the "St. Louis"

tract was settled upon the complainants' mother by a marriage settlement, the amendment abandons this ground, assumes that the land was given to their mother by her father, and that the executor brought it into the appraisement to enable her to obtain her portion of the residue of the estate. Neither the original or amended bill are thus far sustained by the proof. The will of Laurendine shows that he, and not his daughter, Mrs. Juzan, was the proprietor of the land in question.

The sale and adjudication of the estate of the testator, Laurendine, by the executor, was not a mere division under the will, but invested the purchaser with all the title of the testator. [Civil Code, Art. 2585-6, 2600-2-3.] Not only the beneficiaries under the testator's will purchased the property, but some of it was bought by strangers; this is quite sufficient to show that the auction was intended as a sale. There is no evidence to prove that Mrs. Juzan authorized her husband to invest her credit in the purchase of land and other property, or that she ever assented to it. If her money was used, upon the dissolution of the marriage, perhaps the property purchased would be liable to its reimbursement, yet this burthen being removed, the purchasers title could not be affected. [8 Mart. Rep. N. S. 179; 5 Louis' Rep. 89; 17 Ves. Rep. 56; 18 Id. 499.] But the frame of the bill does not authorize relief upon the ground that the husband has converted the paraphernal estate.

Assuming, however, that the land was the separate estate of Mrs. Juzan, it may be asked, what then is the condition of the parties? Daniel Juzan, acting under the prevailing impression that a change of government at Mobile, from Spain to the United States, destroyed the pre-existing state of things, even as it respected the tenure under contract, sold the "St. Louis" tract to Files in 1816; the latter consulted counsel, who pronounced the title good, and under such circumstances, the sale conveyance and mortgage were made. See testimony of Judge Crawford and others.

Judge Crawford states, that he filed a bill in 1816, as the counsel of Files, to set aside the conveyance made by D. Juzan, to his son, of a part of the land, and that the decree offered as evidence was rendered on that bill. Austill, in his

testimony, states that after the death of Files and Juzan, the heirs of the latter employed D. Rust, a member of the bar to prosecute a suit to foreclose the mortgage which Files had executed for the unpaid purchase money; the personal estate of files was insufficient to pay its debts, and witness, as the administrator, upon representing and proving that fact according to law, to the court from which he obtained his appointment, obtained an order to sell the lands in question. They were accordingly sold, in obedience to the decree, and the defendant became the purchaser, subject to the mortgage, paid the purchase money, and received a conveyance in June, 1828.

Defendant paid for his purchase at the commissioner's sale, and to extinguish Armstrong's lease on the land, about $3000; there was due on the mortgage about $3100. The defendant proposed that the complainants and Gunnison, in right of his wife, should contribute equal portions of the sum he had paid to disencumber the land, and be jointly and equally interested in the same. Gunnison assented, but the complainants declined the offer, and accepted in full satisfaction of their interest, twenty-five acres of land, and $250. The consideration paid by the defendant was a just equivalent. In proof of which, and the foregoing facts, see testimony of Mrs. Gunnison, Newbold and Austill..

It is not pretended that there was any fraudulent concealment on the part of the defendant, previous to 1831. The complainant, Peirre Juzan attained his majority in 1821, and the sertlement co nsequent upon the defendant's purchase occurred in 1828.

The employment of counsel to foreclose the mortgage, after the death of Files and the elder Juzan, and the subsequent settlement with the defendant, are implied admissions of the sale to Files, and estop the complainants from denying its validity. *Besides*, the acquiesence of Peirre, for so long a time in the decree which sets aside the deed from his father to him must now prevent him from controverting it; especially as he does not alledge ignorance of its existence.

If one permit, encourage, or acquiesce in a sale, he shall be bound, if there be a valuable consideration, although he be an infant, or *feme covert*. And the same consequence

Juzan, et al. v. Toulmin.

follows where the representation has been made through mistake. [1 Vern. Rep. 137; 2 Id. 239; Sugden on Vend. 522; 1 Johns. Ch. Rep. 354; 2 Brown's Ch. Rep. 388.]

Equity will not interfere against a *bona fide* purchaser for a valuable consideration, on the ground of accident. [1 Story's Eq. § 108.] Nor for a *mistake of fact,* where each party is equally innocent—whether the mistake was mutual or unilateral. [Sugden's Vend. 297-9; 2 Atk. Rep. 8; 2 Story's Eq. 168; 6 Johns. Ch. Rep. 166.] Nor where a party has acted in ignorance of his title upon a mistake of law. [1 Story's Eq. § 139.]

The defendant is entitled to occupy Files' position of a purchaser, against whom it is not pretended any suspicion of unfairness lies. [1 Johns. Ch. Rep. 213; 3 Id. 147; 4 Bibb's Rep. 482; 1 Gill & Johns. Rep. 273.]

The deed which was executed by the complainants, and Gunnison and wife, on the 24th September, 1831, is shown by the answer of the defendant to have been lost, and the answer is agreed to be taken as his affidavit. The preliminary proof was ample to let in secondary evidence of its contents; the defendant was the custodian of the deed, as well as its proprietor. [8 Porter's Rep. 535; 9 Id. 39; 2 Ala. Rep. 61; 5 Id. 439; 6 Id. 589; 7 Id. 126.] Mrs. Gunnison and Lyon prove its execution. Russell's deposition shows that he is solicitous for the success of the complainants. Mrs. Gunnison says he is urging the prosecution of the suit, and Godbold says he informed him, in March, 1844, that he was interested to the amount of $5,000 in the complainants' recovery.

Files was not charged with notice of the proceeding had under Laurendine's will, or of any thing that was shown by the Spanish archives. There was no statute requiring them to be recorded until 1833. [Clay's Dig. 503.] If the answer does not explicitly deny notice, it is enough to say that the rule insisted on by the plaintiff's counsel does not apply in this case, where the defendant insists upon a legal title.

The decree in favor of Files against Peirre Juzan operated as a conveyance—was acquiesced in for more than twenty

years without complaint, and if once reversible will not now be disturbed.

It is supposed by the plaintiff's counsel that the bill filed by Johnston and Files against the heirs of Juzan, suggested to Mr. Elliott, the defendant's counsel, the necessity of the deed of September, 1831. This conjecture is certainly unfounded, as that bill was not filed until November of that year. As for the deed, it most probably was attached to the answer, or filed with it, and lost simultaneously with all the papers in that cause.

If complainants consented to receive the purchase money of Files' administrator, the covenants in the deed made by their father, would be obligatory upon them; and they could not re-assert a title against Files' heirs. Equity, instead of assisting them, would, under such circumstances, have enjoined an action by them. As for the complainant, John B. he sold and conveyed the twelve and a half acres, previous to the commencement of this suit—thus re-affirming what he had before done; and if Peirre Juzan presented a meritorious case, he could not recover in a joint proceeding.

There is no pretence for attributing fraud to the defendant in expressing the belief that his title was good, when the mortgage was satisfied—that he had no intention to overreach the complainants is indicated by the offer that they should come and participate in his purchase. As for a mere *mistake in point of fact,* we have seen it does not authorize the interference of Chancery. But the defendant's representation did not influence the complainants' decision, and they should not now be allowed to come into court to obtain permission to change it. If all other arguments fail, we insist upon the staleness of the claim made by the bill.

COLLIER, C. J.—The allegation in the original bill, that the "St. Louis" tract was conveyed by John Baptiste Laurendine, the elder, to D. Juzan and wife, to the survivor of them, and afterwards to the children of the marriage, is not supported by the proof; and it may perhaps be inferred from the frame of the amended bill, was intended to be abandoned. As a substitute however, for this ground of relief, the complainants state that the elder Laurendine and his wife,

made their will, by which each bequeathed and devised to
the other, one half of their respective estates, and the residue
to their children ; they also alledge the death of the testator
and testatrix previous to the year 1808, and the proceed-
ing in that year, under the sanction of the then Spanish com-
mandant at Mobile, by the executor of their respective wills,
that an inventory, appraisement and division of the estate
committed to him might be made ; *further*, in virtue of these
proceedings, their mother became invested with a separate
estate, in which D. Juzan could have no other interest than
that of a tenant by the courtesy.   It is then alledged that the
interest which passed by the sale to Files, in 1816, ceased
with the death of the vendor, in 1825, and the land in ques-
tion, vested jointly and equally in all his children, as the
heirs of their mother.

The complainants admit that they made a contract by
which they relinquished to the defendant their interest in
the "St. Louis" tract, influenced by the great confidence
they had in him, their connection with him, their want of
education, &c.   *Further*, that there is a deed bearing date
in September, 1831, which indicates this relinquishment, re-
corded in the County Court of Mobile ; but they deny that
it was ever executed by them, or if it was, they were misin-
formed as to its contents, and not being able to read, could
not inform themselves.

We will not stop to inquire whether the wife of D. Juzan
in virtue of the wills of her father and mother, and the conse-
quent proceeding became invested with an estate which de-
scended to her heirs, in despite of any alienation by her hus-
band.   Conceding this to be so, we will consider the trans-
action of the complainants with the defendant upon the pre-
tensions put forth by the bill.

It may be assumed, for it is abundantly proved, that the
complainants were ignorant and uneducated, and reposed
great confidence in the justice, integrity and sound judgment
of the defendant.   Upon this supposition, we will examine
the law applicable to the grounds upon which the invalidity
of the exclusive claim of the defendant is drawn in question.
It is said to be equally a rule in courts of law and equity, that

fraud is not to be presumed, but must be established by proof. Not however by mere circumstances of suspicion, leading to certain results, but if not by positive and express proof at least by circumstances affording strong presumptions. [1 Story's Eq. 199, 200.]

If one person makes a representation to another, who is going to deal in a matter of interest, *upon the faith of that representation*, he shall make it good, if he knew it to be false. But to induce the interference of equity in such a case, it is not enough to establish the fact of misrepresentation ; it must also be shown to have been in a matter important to the interests of the other party, and that it actually did mislead him. For if such was not the character and effect of the misrepresentation, no prejudicial consequences resulted from it.

A misrepresentation may be as well by deed or acts, as by words ; by artifices to deceive as well as by positive assertions. And whether a party misrepresenting a fact knew it to be false, or made the assertion without any precise knowledge on the subject is immaterial, for the affirmation of what one does not know, or believe, to be true, is equally in morals and law, as unjustifiable as the affirmation of what is known to be positively false. So if a party innocently misrepresents a fact by mistake, it is equally conclusive ; for it operates as a surprise and imposition on the other party. But a misrepresentation in a matter of opinion and fact, equally open to the inquiries of both parties, and in regard to which neither could be presumed to trust the other, unless it be a mere contrivance of fraud, in cases of peculiar relationship or confidence ; or where the other party has justly reposed upon it, and has been misled, furnishes no ground for the interference of equity. [1 Story's Eq. 200 to 212.]

Nearly allied to the fraud which is perpetrated by *suggestio falsi*, is that which is inferable from *suppressio veri*. To constitute the latter, there must be a suppression of facts, which one party is under a legal or equitable obligation to communicate, and in respect to which he cannot be innocently silent ; because the other has a right, not merely in *foro conscientiæ*, but *juris et de jure*, to know. [1 Story's Eq. 213 to 224.] Where there is a peculiar relation of a confi-

dential and fiduciary character, as principal and agent, trustee and *cestui que trust*, &c., to prevent the undue advantage which the situation of one of the parties gives him over the other, the law requires the utmost degree of good faith in all transactions between them.   If, in such case, there is any misrepresentation, or concealment of any material fact, or any just suspicion of artifice, or undue influence, courts of equity will interpose, and pronounce the transaction void, and as far as possible restore the parties to their original rights. [1 Story's Eq. 224, *et post.*]

In regard to acts done and contracts made by parties affecting their rights and interests, the general theory of the law is, that in all such cases there must be full and free consent, in order to make it binding upon them.   Hence it is said, that if consent be obtained, by meditated imposition, circumvention, surprise, or undue influence, it is to be treated as a delusion, and not as a deliberate and free act of the mind.   For although the law will not inquire generally into men's acts and contracts, to determine whether they are wise and prudent, yet it will not suffer them to be entrapped by the fraudulent contrivances, or cunning, or deceitful management of those, who purposely mislead them.   [1 Story's Eq. 227.]

Mere weakness of intellect, if the party is *compos mentis*, does not deprive him of the capacity to contract; but imbecility of understanding constitutes a material ingredient in examining whether a bond, or other contract has been obtained by fraud, or imposition, or undue influence; for although a contract made by a man of fair understanding, may not be set aside, merely because it was a rash, improvident, or hard bargain, yet if made with a person of imbecile mind, the inference naturally arises, that it was obtained by circumvention or undue influence.   [1 Story's Eq. 238 to 242.]   In Blackford v. Christian, 1 Knapp's Rep. 77, Lord Wynford said, a bargain into which a weak mind is drawn, under the influence of deceit and falsehood, ought not to be held valid. And a degree of weakness of intellect far below that which would justify a jury, under a commission of lunacy, in finding him incapable of controlling his person and property, coupled with other circumstances, to show that the weakness, such as

· it was, had been taken advantage of, will be sufficient to set aside any important deed.

Mere inadequacy of price, or other inequality in the bargain, is not, it is said, to be understood as constituting *per se* a ground to avoid a bargain, in equity.   Courts of Equity as well as courts of law, act upon the ground, that every person, who is not, from his peculiar condition or circumstances, under disability, is entitled to dispose of his property in such manner, and upon such terms as he chooses; and whether his bargains are wise and discreet or otherwise, profitable or unprofitable, are considerations not for courts of justice, but for the party himself to deliberate upon.   Where however, the inadequacy is such as to demonstrate some gross imposition, or undue influence, or, to use an expressive phrase, shock the conscience, and amount in itself to conclusive and decisive evidence of fraud, equity ought to interfere.   And gross inadequacy of price, when connected with suspicious circumstances, or peculiar relations between the parties, affords a vehement presumption of fraud.   [1 Story's Eq. 240-50; Eaton v Patterson, 1 S. & P. Rep. 9; Bozman, et al. v. Dranghan, 3 Stew. Rep. 243.]

We have thus concisely stated the law applicable to the grounds upon which the contract between the parties has been assailed in argument, and have gone quite beyond what the allegations of the bill required.   It has not been thought necessary to cite the authorities upon these points in detail ; they are noticed by Mr. Justice Story, in his Commentaries upon Equity, and do not lay down the law more favorable to the complainants than the summary we have made.

There is certainly nothing in the proof found in the record, to indicate that the defendant made any misrepresentation, or suppressed any material fact, which could have influenced the complainants' judgment in entering into the contract with him.   It cannot be inferred that he had any information in respect to the title to the land, of which they were not fully in possession.   So far from profiting by his superior intelligence, and great influence over the complainants, the defendant proposed to them shortly after his purchase at the commissioners' sale, and of Armstrong's lease, that they should participate with him in the land, and become joint proprie-

tors together with their brother-in-law, Mr. Gunnison, upon
contributing equal shares of what he had expended in disen-
cumbering it.    The defendant did not deny their right to be
paid their proportions of what was due upon the mortgage ;
this seems to have been conceded, and the cash payments
and conveyance of the twenty-five acres was intended to ex-
tinguish it.    Whatever the defendant may have thought of
his title, the mortgage being extinguished, it is not material
to consider, as it is perfectly clear that he did not insist on
its validity as against the complainants ; but was not only
willing, but actually proposed that they should enjoy the
" St. Louis" tract upon equal terms with himself.    In de-
ciding upon this proposition, we can discover no reason for
concluding that its rejection was not voluntary ; and the evi-
dence is altogether satisfactory to show that their consent was
freely given to the agreement which was entered into, to ac-
cept two hundred and fifty dollars in money, and twenty-
five acres of land, including the family residence, in full sa-
tisfaction, not only of what was due upon the mortgage, but
of their claim to the land.    This is abundantly shown by
the testimony of Mrs. Gunnison and Newbold, both of whom
testify fully and directly to the point.    The latter says, up-
on hearing of the arrangement, shortly after it was agreed
upon, he advised the complainant to apply to the defendant
for more land, to which they answered that they had as much
land as they wanted ; that they had rejected the offer of the
defendant to take an equal share of the land, upon the pay-
ment of the same proportion of the purchase money, and were
perfectly satisfied.    In addition it may be said that there is
nothing to warrant the conclusion that the defendant has
availed himself of his connection with the complainants, or
their confidence to gain an advantage which they did not freely
accord.    To say nothing of the evidence furnished by other
witnesses, Mrs. Gunnison explicitly affirms that he has al-
ways dealt justly with them.

The defendant must have paid, or made himself liable for
about six thousand dollars in acquiring the land in question,
including the sum due on the mortgage, the amount paid to
Files' administrator, and to Armstrong on his lease.    It is
difficult to say what was its value in 1825.    Mr. Russell

says it was probably worth fifteen or twenty thousand dol-
lars, while Mr. Newbold puts it down at five thousand dol-
lars. The truth, we presume is, that unimproved land, situa-
ted so remote from the city, had no defined value at that ear-
ly day, but depended rather upon its particular locality, and
the conjectural estimate which those desirous of purchasing
might form of the future growth of Mobile. It is not pre-
tended that any effort was made by the defendant, or any one
else, to disparage the title which would be acquired by a pur-
chaser at the commissioners' sale ; but it is fairly inferable
from what seemed to be the opinion as to the title of D. Ju-
zan, that it was supposed a purchaser would occupy the si-
tuation of Files' heirs, and upon the mortgage being discharg-
ed, would have a perfect title. This being the case, it is
safer to take the sum at which the defendant purchased, with
the incumbrance of the mortgage and lease, as a criterion of
value, than the mere opinions of witnesses at this distance of
time, no matter how honestly formed. But it cannot be im-
portant to consider whether the defendant disembarrassed the
title, and acquired the possession at a sum much below the
value of the land ; for if this was so, he claimed no exclu-
sive benefit from it, but voluntarily tendered to the defend-
ants an equal participation in it.

The proofs in the record do not enable us to determine, with
any degree of accuracy, what was the value of the twenty-five
acres allotted to the complainants—its precise location in respect
to the residue of the tract—the character of its soil, whether
comparatively inferior, or more fertile—the extent of the im-
provements, their cost, &c. Nearly all the witnesses, con-
cur in the opinion that its situation and improvements made
it more valuable than any part of the tract of the same extent.
Perhaps too, not only the complainants, but their sisters also,
may have placed a higher estimate upon it, because it was
the parental homestead, in which they had been nurtured
from their earliest childhood. Whatever may be the truth
of the case, it cannot be assumed that in the transaction be-
tween the complainants and defendant, there was such un-
conscionableness or inadequacy of consideration given for
what the former yielded up, as would " shock the consci-

ence, and amount in itself to conclusive or decisive evidence of fraud."

What has been said will show that there was no meditated imposition, circumvention, surprise, or undue influence in the sense in which the law understands these terms, and it cannot therefore be said that the complainants were beguiled into a contract which their better informed judgment would have repudiated. It is not alledged that the complainants are persons of such imbecile intellects as to require a Court of Equity to scan their contracts with unusual care, or guard their interests with extraordinary circumspection—the want of education and information is the extent to which the allegation and proofs go.

Can the complainants all unite in a bill which seeks to set up the deed executed by D. Juzan to his son Pierre in 1815, or would not the union of such a ground of relief, with allegations which equally affect all the complainants, make the bill multifarious? However this might be, if the bill were thus framed, no relief is prayed, but such as pertains to the allegations, which alike affect all the complainants. The separate deed then, to the complainant Pierre, may, in the consideration of this case, be placed entirely out of view. We would, however, remark, that as more than twenty years, which was the limitation to actions for the recovery of real estate, when this suit was commenced, had elapsed after he attained his majority, and the assertion of an adverse claim had been continued for a longer period, we cannot very well perceive how he can be relieved in Equity, even conceding that the decree annulling the deed, at the instance of Files, is itself a nullity.

The complainants aver that a deed, dated the 24th September, 1831, by which they purport to relinquish all their interest in the " St. Louis" tract is recorded in the County Court of Mobile—they declare that they have no recollection of ever having executed that or any other deed for the land in question, and therefore deny its genuineness. G. C. Russell, whose name appears upon the record as a subscribing witness, testifies that he has no recollection of ever having attested the original, believes he did not, and thinks it questionable whether he was about Mobile at the time.

87

The defendant repels the allegation in respect to the spuriousness of the deed with a positive denial, and declares that it was executed by the complainants, with full knowledge of what they were doing. Mrs. Gunnison testifies "That she, her husband, Pierre and John Juzan executed a deed for the "St. Louis" tract to T. L. Toulmin, in September, 1831." J. G. Lyon who was clerk of the Circuit Court of Mobile, in 1831, states that in that year he was at the house of the defendant, and there found the complainant Pierre, with his shoulder dislocated, so that he could not use his hand ; witness believes he then signed the name of Pierre (at his request) to a deed which he executed to the defendant, and believes the deed in question is the one which was then executed, as there is no other deed between the same parties attested by him. Witness has a pretty distinct recollection of having taken the acknowledgment of Mrs John B. Juzan, and thinks it was to the same deed. He has no recollection that G. C. Russell attested the deed, though he thinks he was at the defendant's house at the time referred to. Witness believes that the deputy of the clerk of the County Court, who registered the deed, was familiar with his hand-writing, and would not have recorded it, unless the acknowledgment of its execution, which purports to have been made by him, was genuine.

Lewis, who was clerk of the County Court when the deed was recorded, states, that both himself and deputy were familiar with Mr. Lyon's hand-writing ; that he believes it could not have been counterfeited, while he was clerk, so as to have caused the registry of a deed which purported to have been acknowledged before him.

This proof, we think quite sufficient to establish the existence of the deed. Mr. Russell's testimony amounts to no more than this, viz : that he has no recollection of ever having attested a deed similar to that in question, and expresses confident belief that he never saw or heard of it for years after it bears date, when, for the first time, he saw it upon record in the County Court of Mobile. It is difficult to avoid the conclusion, however accurate the memory of Mr. R. generally is, (as one or more of the witnesses state,) in this instance it is most probably at fault. Be this as it may,

when his testimony is placed in opposition to that of Mr. Lyon and Mrs. Guumison, to say nothing of the defendant's answer, it must yield to the positive statement of facts and circumstances they respectively narrate. The ordinary tests applied to ascertain facts, and the rules by which evidence is weighed, both show a preponderance of proof on the part of the defendant. Here the complainants' witness has no recollection of ever having attested, seen or heard of the deed, and hence concludes that it was never executed as it purports; while one of the defendant's witnesses positively affirms its execution by herself, her husband, and the complainants, and the others state facts which directly corroborate her testimony, and standing alone, is quite as potent a witness as Mr. R. In this state of proof there is but little room for controversy upon this point.

Parties and persons interested, are recognized as competent witnesses, in respect to the facts and circumstances necessary to lay a foundation for secondary evidence of a writing, as that a search has been made and it cannot be found. [3 Phil. Ev. C. & H's Notes, 1218-9, and cases there cited.] No certain rule can be laid down as to the proof necessary to establish a loss; the degree of diligence must depend on the nature of the transaction to which the paper relates, its apparent value and other circumstances. The rigor of the common law, it is said, has been relaxed in this respect, and the non-production of instruments is now excused for reasons more general and less specific, upon grounds more broad and liberal than were formerly admitted. If any suspicion hangs over the instrument, or that it is designedly withheld, a rigid inquiry should be made into the reasons of its non-production. But when there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original—in fact courts in such cases are extremely liberal. [3 Phil. C. & H. Notes, 1223 to 1233; 1 Starkie's Ev. 349 to 354, 1 Am. ed.; Greenl. Ev. 593-4.]

In Mordecai v. Beall, 8 Porter's Rep. 529, the plaintiff proved that a deed under which he claimed had once existed, and traced it to the possession of a third person, who had intermarried with the grantee, a female; proved that it had been demanded of that person who failed to produce it,

and that he now resided in another State. *Further*, that search and inquiry had been made of others, who it was supposed might have the deed, but without effect. It was held, that the preliminary proof was sufficient, and as it could not be intended that the plaintiff had any motive in withholding it, a copy from the records of the court was admissible. To the same effect is Swift v. Fitzhugh, 9 Porter's Rep. 39; Beall v. Dearing, 7 Ala. Rep. 124.

The defendant states in his answer, that he thinks he handed the deed of September, 1831, together with other papers, to his counsel, the late Mr. Elliott, to enable him to prepare his answer, and make defence to a suit in Chancery commenced against himself and the heirs of D. Juzan, deceased, in November, 1831, by Thomas Johnston and the heirs of D. Files. That he has never seen it since his answer in that cause was filed, though he has made the most anxious and diligent search for the deed, and caused a search to be made among the papers of his late counsel; that hoping to find it in the file of the cause referred to, he applied at the proper office, and was informed that not a paper pertaining to it was remaining in court. He thereupon employed the register in Chancery, and the former deputy clerk, as well as others to examine all the files and books of reference in the court of Chancery, as also in the Circuit Court, on the equity side of which the suit was instituted and determined. But all his efforts to recover the deed proved unavailing. This answer, conceding to it the force of testimony, it is insisted, is not sufficient to establish a loss, so as to let in secondary proof, and if it was, its effect is destroyed by the evidence of the complainant's witness, S. Chastang. In respect to the testimony of this witness, it by no means establishes the existence of the deed of September, 1831. He merely states, that the complainant, John B., married his sister, that he spent a night at the defendant's house since the institution of this suit, when the defendant "brought out a pocket book, from which he took a paper and read a portion of it to deponent, containing the names of the complainants." Defendant "said this was a deed from the complainants for the land now sued for; defendant did not leave the deed in his hands, nor does he know any thing of what it contained of

his own knowledge." This witness thus disclaiming all knowledge of the contents of the paper produced, his testimony is worth nothing, except so far as it relates the statement of the defendant to him ; and thus far we think it may be reconciled with the assertion of the loss of the deed, which is made in the answer, by supposing that the paper which the defendant took from his pocket book was a transcript from the record of the County Court. The presumption is both reasonable and natural, that the defendant obtained such a copy, if he had not the original in order to prepare his defence ; and if he had the original, which he did not intend to produce, it can hardly be believed that he showed it to the witness ; especially as he was nearly connected with one of the complainants.

The evidence then, is such as induces a fair presumption of loss, and we cannot see in the facts any thing to warrant the inference that the deed is designedly withheld. [See 1 Caine's Cas. in Ev. 27 ; 2 Johns. Cas. 488 ; 2 Caine's Rep. 367 ; 3 McC. 322 ; 3 Wend. Rep. 296 ; 1 Pet. Rep. 591-6 ; 3 Verm. Rep. 399 ; 12 Johns. 194 ; 9 Cow. Rep. 208 ; 1 Carr. & P. Rep. 282 ; 4 Wend. Rep. 543 ; 7 Pet. Rep. 99 ; 6 Binn. Rep. 59.] It is difficult to conceive of any object that could have been promoted by the forgery of Mr. Russell's name as a subscribing witness to the execution of the deed. It was good without any witnesses, where, as in this instance, it was acknowledged by the grantors ; and the law was so ruled by this court, previous to 1831. The evidence of loss, then, being sufficient, it was allowable to prove the contents of the deed by a copy from the registry.

But conceding that the evidence was both incompetent and insufficient to establish the deed and its contents, and is the complainant's title to relief made out? We will not stop to inquire whether, as the complaints have denied the genuineness of the deed, which is registered, and the defendant sufficiently excuses its non-production, the *onus* does not rest upon the complainants, of showing that it was not executed by them ; or if this be not so, whether under the state of the pleadings, less conclusive proof of loss is not sufficient to let in secondary evidence of its contents. Placing the deed entirely out of view, and we have seen, that the

proof is satisfactory to show the contract between the complainants and defendant, by which the former agreed to receive twenty-five acres of land, embracing the parental homestead, and two hundred and fifty dollars in money, and relinquish to the defendant all claim to the residue of the "St. Louis" tract. This contract has been executed, on the part of the defendant, by paying the money to the complainants, allowing them to retain the possession of the land allotted to them; and he is, and has been at all times, ready to furnish them the proper evidence of title. We have seen that this contract is not unconscionable, or fraudulent for inadequacy of consideration, for fraudulent concealment or misrepresentation, or an undue influence exerted over, or advantage taken of the complainants. Is it so hard a bargain on the part of the complainants, that Chancery would not decree a specific execution, at the instance of the defendant, if they had not already executed the proper deed? We incline to think not, and the acts of part performance certainly take it out of the statute of frauds. But if the contract is so unequal that it would not be specifically enforced against the complainants, we have seen it would not be set aside at their instance. This being the case, it is the obvious result of what has been said, that the complainants are not entitled, upon the case made out, to relief against their contract with the defendant.

If, however, every imputation against the transaction, which is made, either upon the record or in argument, were fully made out, it might still be asked whether the complainants have not slumbered too long upon their rights, so as to exclude them from the interposition of equity, in consequence of the staleness of the application ? *Vigilantibus et non dormientibus leges subveniunt.* [Wood v. Wood, 3 Ala. Rep. 756 ; Johnson v. Johnson, 5 Id. 90; 1 Caro. L. Rep· 508; 3 J. J. Marsh. Rep. 15 ; 1 Russ. & M. Rep. 236, 539 ; 3 Rand. Rep. 117 ; 4 Id. 454; 2 Moll. Rep. 157.] We content ourselves merely with making this inquiry, and citing these authorities ; the conclusion expressed upon other points renders its solution unnecessary.

Whether the contract was entered into under a mistake of

law or fact, we cannot regard as at all material, since it is clear that it was made in good faith ; each party possessing equal information, or at least equal means of acquiring knowledge, and neither having practised towards the other any unfairness or deception.   [1 Story Eq. 125, 145, 146, 159 to 164.] Subsequent events may have made it most advantageous for the defendant—but its legal character and effect remain unchanged.

We have considered with great care the different points decided by the Chancellor, as well as the arguments made at the bar; but we deem it unnecessary to notice others more particularly ; for no matter what opinions we may entertain in respect to them, they · cannot change the conclusion we have already intimated.   The consequence is, the decree of the Court of Chancery is affimed.