1813.

IRISH
et al.
*v.*
SCOVIL.

---

CAUFMAN *against* The Presbyterian Congregation
of Cedar Spring.

IN ERROR.

*Sunbury,
Wednesday,
June 9.*

ERROR to the Common Pleas of *Mifflin* county. It was an ejectment by the Presbyterian Congregation of *Cedar Spring* against *Caufman,* for 200 acres of land, as to

If a tenant for life purchases an adverse title without the consent of the reversioner,

his children and all persons who come in under him or them, are estopped from controverting the reversioner's right to possession, in the same manner as tenant for years or his assignee would be.

Where *boundary* is the subject in question, what has been *said* in relation to it by a person now deceased is evidence.

A written agreement was placed by both the parties in the hands of a common friend, who upon his removal from the scene of the transaction placed it with his father, who died. After proof of these facts, a witness swore that after the father's death, he together with the son-in-law of the father to whom all his papers came, made diligent search among the father's papers, but could not find the writing. *Held*, that this was sufficient proof of the loss, to lay a ground for one of the parties to prove the contents, without the oath of the son-in-law himself as to the search and not finding.

Upon a descriptive location, the deputy surveyor surveyed more than the usual excess, and without the knowledge of the owner, cut off a part of the survey containing the best lands, and answering most accurately to the description, for which another person at the deputy's instance entered a location, and got a return for himself. The owner of the first location not being informed of the circumstance, entered upon the disputed part, and improved it. *Held*, that the return of survey did not prejudice the oldest proprietor, nor benefit the youngest; and that the oldest had title.

1813.

CAUFMAN
v.
CONGREGA-
TION OF
CEDAR
SPRING.

99 acres $\frac{7}{10}$ of which he took defence, under the circumstances detailed in the opinions of this Court. The case was here argued at the last June Term, upon exceptions to the opinion of the Court below in admitting testimony, and in their charge to the jury, all of which distinctly appear hereafter.

*Huston*, for plaintiff in error.

*Watts*, contra.

TILGHMAN C. J. The Presbyterian Congregation of *Cedar Spring*, were plaintiffs below, and obtained a verdict and judgment. In the course of the trial exceptions were taken to the plaintiffs' evidence, and to the charge of the Court. It will be necessary to state the evidence, in order to understand the points in controversy. So early as the year 1763, the plaintiffs began to build a church on that part of the land now claimed by them, which is not in dispute. The settlement having been broken up by the *Indian* war, the building of the church was suspended and not resumed till the year 1767, when it being found that the old logs were rotten they were rejected, and a new church built within about four rods of the site of the old foundation. On the 30th of *March* 1767, a location was entered in the land office " for 200 acres adjoining *Thomas Baxton, Robert* " *Neilson* and *John Wilkes*, ' in the names of *James Patter-* " son and *James Purdy*,' in trust for a Presbyterian Meet- " ing house and grave yard." On these locations the quantity of 332 acres 81 perches was surveyed by *James Wilson*, an assistant of *William Maclay*, deputy surveyor. When *Maclay* was informed of the quantity, he said it was more than he could return; and therefore told *Isaac Calhoun*, under whom the defendant claims, that if he would enter a location for 100 acres, he might take up part of the land, which *Calhoun* accordingly did; in consequence of which *Maclay* cut up the land into two surveys, one of which containing 232 acres 18 perches he returned for the congregation, and the other containing 99 acres 123 perches for *Calhoun*. The part returned for *Calhoun* is much the best in quality, and answers best to the description of the plaintiffs' location. It does not appear that the congregation were in-

formed of the manner in which these surveys were returned; on the contrary they took and always retained possession of the disputed tract, and about the year 1774 or 1775, built a parsonage house on it, which was first occupied by their minister Mr. *Kennedy.* About the year 1779, *Kennedy* was succeeded by the Rev. *Hugh Magill,* who was placed on the land under a written agreement with the congregation, by virtue of which he was permitted to clear woodland and make improvements, for which he was to receive a compensation in case they exceeded the rent. *Magill* while thus in possession, purchased *Calhoun's* title for 40*l.* a sum far below its value, supposing the title to be good. This was about the year 1786. Before the purchase was made, *Magill* informed the congregation of *Calhoun's* claim, and told them that if they did not purchase, he would. It does not appear that the congregation took any steps towards purchasing themselves, but the purchase of *Magill* produced discontent, in consequence of which the matter was referred to the presbytery in the year 1800, when it was finally agreed that *Magill* should hold the possession of the church land during his life and receive an annuity; but he was no longer to remain pastor of the church. He died in possession in the year 1805, immediately after which his children received notice from the plaintiffs to quit the premises. During their father's life, his sons *William* and *Robert* obtained a conveyance from *James Purdy* the surviving trustee of the church, for the sum of 55 dollars; and on the 17th *March* 1807, they obtained a patent from the Commonwealth in trust for all the children of their father. On the 5th *May* 1807, all the children joined in a deed to the defendant with general warranty, in consideration of the sum of 500*l.* secured to be paid to them. As soon as the defendant took possession, the plaintiffs brought this ejectment against him. The charge of the president of the Court of Common Pleas was in favour of the plaintiffs; but at the same time he told the jury, that if they were satisfied that *Magill* purchased from *Calhoun* for his own use, with the consent of the congregation, in that case the defendant would not be estopped from controverting the plaintiffs' title, although he came in under their tenant. He likewise told them that if they were satisfied that the congregation were informed of the defend-

1813.

CAUFMAN
*v.*
CONGREGA-
TION OF
CEDAR
SPRING.

1813.

CAUFMAN
v.
CONGREGA-
TION OF
CEDAR
SPRING.

ant's intention to purchase, and gave no notice of their claim, the verdict ought to be in favour of the defendant.

I have been thus particular in stating the evidence, because there is very little difficulty when the matter is fully understood. We must now take for granted that the congregation gave no assent to *Magill's* purchase for his own use, and that they were not informed of the defendant's intention to purchase. The case then stands simply thus. The defendant purchased from the children of *Magill*, who came in under their father, who was the tenant of the plaintiffs. Under such circumstances shall not the defendant be obliged to restore the possession to the plaintiffs? Certainly he shall. Neither the tenant, nor one who claims under him, shall withhold from the landlord that possession, which by the agreement of the parties, was to be given up at the end of the term; and whether the term was for life or for years there is no difference. This principle is so familiar that authorities need hardly be cited. I will refer, however, to the case of *Galloway* v. *Ogle*, in this *Court*, 2 *Binn.* 468, and *Jackson* v. *Hardie*, in the *Supreme Court of New York*, 4 *Johns.* 210, 211. It is not proved expressly that the defendant knew whence the persons from whom he purchased derived their possession, but that is immaterial; it was his business to know it, and the circumstance of his taking a general warranty renders it probable that he did know it, or at least that he knew the title not to be without suspicion. I have hitherto considered the case upon the facts which I have stated. But on the trial of the cause the defendant objected to the admission of some of those facts in evidence. The validity of those objections is now to be examined. In the first place it was contended that parol evidence of what was *said* by *Wilson* the assistant of *Maclay* ought not to have been admitted, because the official return of survey was the best evidence of the survey. But the evidence of *Wilson's* words was not let in with a view of contradicting the return of survey; it was only to shew what were the boundaries of the plaintiffs' claim. It will be recollected that *Wilson* is dead, otherwise nothing less than his own oath could have been received. Where boundary is the subject, what has been *said* by a deceased person is received as evidence. It forms an exception to the general rule. It was

necessary for the plaintiffs to shew their possession of the lands returned for *Calhoun;* because had they acquiesced in that return, and suffered *Calhoun* to take possession and keep it for any considerable time, they would have been bound by it. But having never acquiesced, they had a right to contend that *William Maclay* had done the wrong, even supposing that not more than 220 acres could properly have been returned upon a location for 200 acres. He ought not to have deprived them of the most valuable portion of the land, especially as it corresponded best with the plaintiffs location. It was impossible for the plaintiffs to shew the extent of their possession, without shewing the lines run by *Wilson.* Those lines were the plaintiffs' boundaries, at least such was their claim. It appears to me therefore that what was said by *Wilson*, came within the exception which admits the words of a deceased person to be given in evidence in a matter of boundary.

The next exception is to the admission of parol evidence to prove the substance of the written agreement between the congregation and *Magill.* To make way for such evidence it must be proved, first, that the agreement once existed; second, that it has been lost or destroyed, which may be done by circumstantial evidence. There was good proof of the execution and existence of the writing, and of its being deposited in the hands of *Joseph M'Clellan*, for safe keeping, so that he was to be considered as a trustee for both parties. On *Joseph M'Clellan's* removal to *Butler* county, he placed the writing in the hands of his father *John M'Clellan.* The father then came into the place of the son, and held the deposit for the benefit of both parties. *John M'Clellan* died, and the plaintiffs had recourse to his son-in-law *James Sanderson*, into whose hands all his papers came. *Sanderson* with *James Knox* made diligent search among the papers of *John M'Clellan*, but the writing was not to be found. This is proved by *Knox.* The defendant's counsel insisted that all this was insufficient, because *Sanderson* was not examined on oath. The Court of Common Pleas were satisfied that enough had been done, and admitted the parol evidence. If this writing had been in the custody of the plaintiffs themselves, it might have been reasonable to hold them to very strict proof of its loss or

1813.

CAUFMAN
v.
CONGREGA-
TION OF
CEDAR
SPRING.

1813.

CAUFMAN
v.
CONGREGA-
TION OF
,CEDAR
SPRING.

destruction. But considering that it was no more in their hands than in those of the opposite party, I am not disposed to differ from the opinion of the Court of Common Pleas. Proof was made of a search by *Sanderson;* and as it was as well known to the defendant as the plaintiffs that *Sanderson* had possession of his father-in-law's papers, by depositions taken in this cause before the trial, the defendant, if he had suspected collusion or negligence in the search, might have examined *Sanderson* on oath. Having thus considered all the points made by the plaintiff in error, I have only to add that upon the whole I am for affirming the judgment.

YEATES J. The first error assigned by the plaintiff in this case is, that the declarations of *James Wilson,* an assistant of *William Maclay,* deputy surveyor of the district, were received in evidence to establish a survey of the lands in question for the congregation, whereas in fact the lands were surveyed and returned on the application of *Andrew Calhoun,* under whom *Caufman* claims. This objection is founded on a misapprehension of the fact. The making of the survey was ascertained by other proof written as well as parol; and it also appeared, that *Calhoun* was informed of this survey prior to his entering his location. But the declarations of *Wilson* were received for the sole purpose of establishing the boundaries of the claim, and the extent of the possession of the congregation. The decision in *Montgomery's Lessee* v. *Dickey,* in *Franklin* county, is a strong case in point upon this subject.

2. It has been contended, that the contents of a written agreement between the congregation and the reverend *Hugh Magill,* their pastor, were shewn by parol, without laying proper grounds for such testimony in the first instance. How stands the fact? In 1778 or 1779 Mr. *Magill* succeeded Mr. *Kennedy* as minister of the congregation, and was put into possession of a house previously erected by the congregation upon what was called the glebe (being the premises in question) and occupied by *Kennedy.* An agreement was entered into between the parties, and deposited in the hands of *Joseph M'Clellan* for safe keeping. Upon his removal to *Butler* county, he delivered this paper to his father *John M'Clellan;* and on his death all his papers came into

1813.

CAUFMAN
v.
CONGREGA-
TION OF
CEDAR
SPRING.

the hands of *James Sanderson*, his son-in-law, who together with *James Knox* made a diligent and strict search for the original agreement, but their endeavours were fruitless. These facts were amply verified by the depositions of *M'Clellan* and *Knox*, taken under a rule of Court; and the Court being fully satisfied of the former existence and loss of this agreement, and that due pains had been used to obtain it, permitted its contents to be shewn in evidence by parol proof. It was objected that *Sanderson* might have retained the paper in his possession, and have subtracted it from the other papers of his father-in-law when the search was made, and that he also should have been examined upon oath. This might have been a prudential measure if pursued, but I can see no absolute necessity for it. The fact was sworn to, that *all* the papers of *John M'Clellan* deceased, were examined carefully, and that the agreement could not be found. There was no reasonable ground to suppose that *Sanderson* would withdraw it, nor could he have any motive for so doing. He united his exertions to find it; and if the Court of Common Pleas were convinced that due diligence had been used to obtain it, they were justified in letting in oral testimony of its contents.

3. It has likewise been urged that the judges below erred in charging the jury, that the congregation were entitled to recover the possession. It appears to me to be a strong case on their part. The congregation began to erect a church a few perches from the tract of land in question in 1763. The Indian war came on, and the inhabitants fled but returned in 1767. On the 30th *March* 1767, *James Patterson* and *James Purdy* took out a location for 200 acres of land adjoining *Thomas Baxton*, *Robert Nelson*, and *John Wilkes*, in trust for a presbyterian meeting house and grave yard. It called with precision for the tract in controversy, and could be laid on no other spot. In the same year they built a new church, and *James Wilson* the assistant of *William Maclay* deputy surveyor, having surveyed 332 acres 81 perches on the meeting house location, *Maclay* under the pretence that he could not return so large a quantity thereon, returned under a latter location of *Andrew Calhoun*, dated 8th *January* 1768, 99 acres 123 perches without the pri-

1813.

CAUFMAN
v.
CONGREGA-
TION OF
CEDAR
SPRING.

vity or consent of the congregation. By these means the congregation would be stripped of the lands which the trustees had specially applied for, and in lieu thereof, would obtain lands which were proved on the trial, to be of inferior quality, and considered relatively were not deemed as exceeding one fourth part in point of value. This conduct was most highly unjustifiable in every view of the case. It is not competent to the proprietary agent to vary the contract of the parties without their consent. In 1774 or 1775, the congregation built a parsonage house on the premises in controversy, north easterly of their church, without any claim on the part of *Calhoun*, and put their minister Mr. *Kennedy* in possession thereof, who occupied the same until 1779, when he was succeeded by the Rev. *Hugh Magill*, who was likewise put into possession by the congregation, under a written agreement which is since lost, that he should reside therein free of rent, and should have liberty to make improvements on the land, for which he was to receive compensation in case they exceeded the value of the rent. Thus living under his flock and superintending their spiritual concerns, he buys in the claim of *Calhoun* for 40*l.* in 1786, which, if his pretensions were well founded, would be worth at least 300*l.* The congregation are justly displeased with him, but he is suffered to continue on the land. In 1800 the matter is heard in presbytery; and at length it was mutually agreed that *Magill* should hold possession of the glebe during his natural life, and receive an annuity. He gave up the sacramental cups &c., and separated from his flock as their pastor. All this seems incompatible with his pretensions under the adverse title of *Calhoun*. *Magill* died on the land in 1805, and immediately afterwards, notice was given to his children to quit the premises. Previously thereto, on the 1st of *February* 1802, *William Magill* and *Robert Magill* two of the sons, fraudulently obtained a conveyance from *James Purdy* the surviving trustee of the congregation, in consideration of 55 dollars; and after their father's death, on the 17th of *March* 1707, obtained a patent from the Commonwealth in trust for all the heirs, and all the children join in a conveyance to *John Caufman* on the 5th of *May* 1807, with covenant of general warranty. Immediately after

*Caufman* received possession, an ejectment was brought against him.

Upon this statement of the facts, I can see little difficulty in deciding in whom the title is; or as it is frequently expressed, who had the best right to the patent. The question whether the congregation were guilty of any constructive fraud in not giving notice to *Caufman* previous to his purchase, was fairly submitted to the jury, and they have decided against it. Their possession by their tenants operated as full notice of their claim. They had the earliest location, particularly describing the premises, which could be satisfied no where else, which was followed up by an early survey, and though not properly returned, the actual survey formed a complete contract. If the surveyor general would not receive the survey on the ground of the large quantity of land contained therein, the surplus thrown out should not have been of such part as was specially called for by the application, but on the other side of the tract where the lands were of inferior value, and notice given thereof to the trustees of the church. The conduct of the deputy herein, could not affect the interests of the congregation, unless they acquiesced therein after notice of the fact, of which there was no evidence. *Hugh Magill* came into possession under them as their tenant, and neither in a legal nor moral sense could withhold the possession from them against the plain tenor of their contract. His children came in under him, and also their vendee, and they all stood in the same relative situation towards the original landlords. The plain consequence is, that *Caufman* must resort to his covenant of general warranty upon his eviction, for the redress of the injury he has sustained.

I am of opinion that the judgment of the Court of Common Pleas be affirmed.

BRACKENRIDGE J. having been prevented by sickness from sitting on the argument, gave no opinion.

Judgment affirmed.