## Krise *versus* Neason *et al.*

1. To make a copy of a lost instrument admissible, the evidence of the genuineness of the original must be of the most positive kind.

2. V. and G. executed an agreement and jointly delivered it to R. to keep; he was the agent of both for that purpose.

3. It was R.'s duty not to part with it to any one and to furnish a copy when required, to either party.

4. R.'s acknowledgment of a paper produced by him as the original was primâ facie evidence of its genuineness.

5. One witness swearing to the handwriting in a paper is sufficient to take it to the jury, although he may be contradicted by any number of witnesses or circumstances.

6. The question of admissibility for the court is always the prima facies; the sufficiency is for the jury.

7. R. died, search amongst his papers was all that was required to admit secondary evidence.

8. R. was called on for the paper, he made a copy which he gave to the witness to whom he read the original, for comparison. R. being the agent of both, the presumption was that he read correctly.

9. Whether one reading the original to another holding a copy or whether the copy and original should not change hands; not decided.

10. Cauffman *v.* Presbyterian Congregation, 6 Binn. 59, recognised.

October 24th 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Cambria county:* No. 78, to October and November Term 1869.

This was an action of ejectment for 100 acres of land brought, May 8th 1866, by Valentine Krise against John Noal, Washington Neason and James Neason.

The plaintiff, on the 28th of August 1857, became the owner of about 200 acres of land. The defendants claimed under George Krise, brother of the plaintiff, to whom they alleged the plaintiff sold the 100 acres in dispute, being part of the land, October 1st 1840, by articles of agreement of that date drawn by James Ross and left in his possession. The articles were lost, and the point in the case arose upon the questions whether a paper given in evidence was properly admitted, and whether it was a true copy of the articles.

The case was tried, June 11th 1868, before Taylor, P. J.

The plaintiff proved his primâ facie title.

J. Fenlon testified that Ross was dead, the largest portion of all Ross's papers, drafts, articles of agreement, &c., "papers of almost every character you could mention," came into his possession; that Ross lost a good many of his papers before he died; witness looked for the agreement as well as he could, he did not know where else to look than he had looked; he could not find the agreement; was entirely satisfied it was not in his (witness's) possession. A paper alleged to be a copy of the agreement was shown to the witness. He said he was acquainted with Ross's writing; that the body and signature as a witness was in Ross's hand, also a certificate at the bottom and his name.

John Krise, brother of plaintiff, testified that he leased the land in dispute from George Krise; the plaintiff brought an ejectment against him, Ross held the original agreement between plaintiff and George, witness went to Ross and got a copy of the article, he heard the plaintiff say that Ross had the agreement, saw Ross make the copy from the agreement, believed the paper shown to be the copy which Ross gave him. When witness got the copy from Ross, "he took this copy of the original paper that he had and gave me this. I had not the original in my hands that I recollect of. I took this paper by his reading both of them over. I suppose he told me this was a true copy. I did not sit, I think, near enough to Mr. Ross to see him write it, but I did not sit far off him either. I saw the handwriting of George Krise and Valentine to the paper. I did not sit near enough to see the handwriting. I cannot say that I saw the names of George Krise and Valentine to the agreement; I cannot remember: most probably I did. Mr. Ross read the copy to me to see if it was right. I think that I can recollect that he read to me that these twenty-five dollars was not to be paid until there was a good and sufficient title made." Ross read the copy to witness to see if it was right.

[Krise *v.* Neason.]

Witness had heard plaintiff say more than once that he and George had an article of agreement; that $50 had been paid on the land, and that the agreement was lost.

The defendant gave in evidence the record of suit brought, September 16th 1846, by Valentine Krise against George Krise and others for the land in dispute in this case. Messrs. Hasson, Cox and Johnston were of counsel with the defendants. The jury was called in the case, October 4th 1847, and on the 5th the plaintiff suffered a nonsuit.

J. E. Scanlan, the administrator of Hasson, testified that he had examined Hasson's papers and could not find the agreement.

Mr. Johnston testified that he never had any of the papers in the case; he never had the agreement between plaintiffs and George Krise.

The defendants then offered the copy of the agreement in evidence; it is as follows:—

"This article of agreement, made, &c., this 1st day of October, A. D. 1840, between Valentine Krise, of, &c., of the one part, and George Krise, of, &c., of the other part, witnesseth: That the said Valentine hereby agrees to sell, and. has, by this agreement, sold to the said George Krise, 100 acres of land—part of the farm on which he, the said Valentine, now lives—beginning, &c. (describing by courses, distances, &c.), for which the said Valentine binds himself, &c., to make to the said George, his heirs or assigns, a good and sufficient deed, to be made and delivered wthin six months from this date. The said George on his part covenants and agrees to and with the said Valentine, that, as a full consideration for the above, that he will pay $50 now in hand, and on the completion of the title, that he will pay, or secure to be paid, the further sum of $25, which will be the full consideration for the the within described tract, parcel of land; and for the true performance, &c. In witness whereof, &c.

"VALENTINE KRISE. [L. S.]
                                                           his
"GEORGE ✕ KRISE. [L. S.]
                                                          mark
"Attest: JAMES ROSS."

ENDORSEMENTS.

"Received, October 1st 1840, of George Krise, $50, as mentioned in this article.                    VALENTINE KRISE."

"I hereby certify that the above and foregoing is a true copy of the article and receipt thereon written, as left by the parties in my possession and with me remaining this 14th day of June, A. D. 1847.                                        JAMES ROSS."

The paper was admitted and a bill of exceptions sealed.

The defendants then gave evidence tracing the title to James Neason, one of them, on the 20th of December 1864.

[Krise *v.* Neason.]

H. G. Krise, son of plaintiff, testified that George, who lived in Ohio and was on a vist to Cambria county, had told him he had been very foolish to pay his brother 75 cents an acre to live in the woods; that he was too old a man to clear up land to make a living; that he would have to leave it and go somewhere where the land was cleared; that he never would have a home on it if he did live on it; that while he did it was to be a home, and if he died on the place it was to fall back to the original tract, and if he moved off, it was also to fall back. * * *  "I heard him say he made a foolish bargain in giving 75 cents an acre for the land. That bargain was made when he was in the first time. I think Mr. Ross wrote it. It was in writing, and given to Mr. Ross to hold afterwards. George got tired working in the woods; said he was too old a man; had nothing to live on only days' work. I was present when the agreement was signed. He paid $50 on it then. I think there was a receipt endorsed on the agreement. I can't tell how long Ross held the agreement, but in 1844 I went after it and he had not it then. He said it had been lost or burned with a good many valuable papers he had at Hollidaysburg. He did not say whose possession it was in there. He said he would have to try and make another one as near like it as he could, between the parties." * * * "Father always claimed the land since I can recollect; he just gave George the privilege of living on it as a home. I was present when this bargain was made; he agreed to let his brother have 100 acres of land to live on, and if he moved off it was to fall back, and he asked him then the sum of $75 for that privilege. That was put into the agreement. I heard it read, and saw them sign their names—father, Uncle George, Ross and grandmother. Ross, I think, was the last on the list, and grandmother was a witness." The article was read to the parties after writing.

V. W. Krise testified that the agreement was that the land "was to be a home for him (George) as long as he would live on it. I was there when they wrote the article, and afterwards. * * * The article was written the first time when he was in, and this conversation was then, and afterwards. When he moved back again father told him he did not know as he ought to let him be on the land if he did not come when he was to come; then he agreed to let him have it so long as he would live on it, although he had broken the article. * * * There was never anything said about $25 to be paid, that ever I heard. Seventy-five cents an acre was to be paid for a home, and he was to have 100 acres so long as he would live on it, and if he moved off it was to fall back to father, if he died on it it was to fall back to father. The agreement was given to Ross."

There was evidence that George went into possession, and also other evidence bearing upon the question of the agreement.

The verdict was for the defendant, and the case was removed

[Krise v. Neason.]

to the Supreme Court by the plaintiff. He assigned the following errors :—

1. Admitting in evidence the paper alleged to be a copy of an agreement between Valentine Krise and George Krise, because there was not sufficient proof before the court of the execution and delivery by the parties of the original agreement.

2. Admitting in evidence the paper purporting to be a copy of the alleged agreement between Valentine Krise and George Krise as secondary evidence, because no search had been made amongst the papers of George Krise, one of the parties to the agreement, and the party under whom the defendants claimed title; nor amongst the papers of James Ross, deceased, which were not in the possession of John Fenlon, Esq., nor at the former place of residence of James Ross, during the time he was alleged to have had the original paper in his possession.

3. Admitting in evidence the paper certified to be a true copy by James Ross, the 14th June 1847, of the agreenent between Valentine Krise and George Krise, because the same was nothing more than the statement or certificate of Ross, unsupported by his oath or affidavit; nor was the same proven to be a correct copy of an original agreement signed and delivered by the parties.

4. Admitting secondary evidence of the contents of the alleged agreement between Valentine Krise and George Krise, for the reason that no search had been made for the original amongst the papers of Joshua F. Cox, Esq., who was the leading counsel for the defendants in the case of Valentine Krise against John Krise and others, which was an ejectment for the same land, by the same plaintiff against the former claimants of the same title, as that under which the present defendants claim to hold.

He assigned also for error, parts of the charge, but as they involved the same principles as those in the bills of exception to the evidence, they are omitted.

*G. M. Reade*, for plaintiff in error.—In any case an opinion of handwriting must be founded on knowledge : Taylor *v.* Sutherland, 12 Harris 333; Hamsher *v.* Kline, 7 P. F. Smith 397. Before proving the contents, the existence of the instrument must be proved: McReynolds *v.* McCord, 6 Watts 288 ; Stone *v.* Thomas, 2 Jones 299 ; Porter *v.* Wilson, 1 Harris 641 ; McCredy *v.* Schuylkill Nav. Co., 3 Whart. 424; Power *v.* Fricke, 2 Grant 208 ; Tack *v.* Woods, 5 Casey 375. Only the original of an ancient document proves itself : Lau *v.* Mumma, 7 Wright 267 ; McReynolds *v.* Longenberger, 7 P. F. Smith 18. The search was not sufficient: Parks *v.* Bird, 3 Barr 360 ; Hartz *v.* Woods, 8 Id. 471; McGregor *v.* Montgomery, 4 Id. 237 ; Bierne *v.* Cunningham, 1 Wright 228 ; Vuyton *v.* Brenell, 1 Wash. C. C. R. 467 ; McConahey *v.* Centre Turnpike Co., 1 Penna. R. 428. The

16 P. F. SMITH—17

[*Krise v.* Neason.]

authentication by Ross's certificate was not enough: Piper *v.* Lodge, 16 S. & R. 214; Kern *v.* Swope, 2 Watts 75; Paull *v.* Mackey, 3 Id. 110; English *v.* Hannah, 4 Id. 424; Gilmore *v.* Wilson, 3 P. F..Smith 195. Search should have been made amongst Mr. Cox's papers: Parks *v.* Dunkle, 3 W. & S. 291; Simpson *v.* Dall, 3 Wall. 460.

*R. L. Johnston,* for defendants in error, as to 1st error, cited Taylor *v.* Meekly, 4 Yeates 79. As to 2d, Cauffman *v.* Presb. Cong., 6 Binn. 59. As to 3d, Kern *v.* Swope, 2 Watts 75; 1 Starkie on Ev. 341.

The opinion of the court was delivered, January 3d 1871, by

SHARSWOOD, J.—It is certainly not to be denied, or even doubted, that to make a copy of a lost instrument of writing admissible, the evidence of the genuineness of the original from which it was taken must be of the most positive and unequivocal kind: McReynolds *v.* McCord, 6 Watts 288; Stone *v.* Thomas, 2 Jones 209; Porter *v.* Wilson, 1 Harris 641. But it does not follow that the only mode of establishing such genuineness is the testimony of a witness who saw the handwriting of the parties, and who knew and was able to identify it as such. If the party sought to be charged should himself hand the paper as genuine to a copyist, that certainly would be such an unequivocal acknowledgment of its genuineness as to dispense with any other evidence. The circumstances in evidence on the trial of this case as to the genuineness of the paper, a copy of which was offered and received, appear to us to be equal to such an acknowledgment.

That there had been in existence an article of agreement, was a fact established beyond all controversy. Indeed it was not denied. That it was a contract of sale of the 100 acres of land for which the ejectment was brought at 75 cents per acre, that $50 was paid on account and a receipt written on the instrument, were facts testified to by the plaintiff's own witnesses, as well as those of the defendant. A son of the plaintiff, examined on his behalf, was present at its execution. It was also in evidence by the testimony of both parties, and not disputed, that this written contract of sale was delivered to James Ross to keep as the mutual friend and custodian of both parties. He was the agent of both and each of them for this purpose. It appeared also, without contradiction, that the vendee, who was a brother of the vendor, had taken possession of the premises, and had afterwards made a lease to another brother. The present plaintiff then commenced an action of ejectment against the tenant, who, before the day of trial, called on Ross for the purpose of procuring a copy of the contract to submit to his counsel and prepare for his

[Krise *v.* Neason.]

defence.   In his presence Ross made a copy from a paper which he produced as the original.   That copy is the one now in question.   It was compared in the presence of the witness.   Ross wrote and signed a certificate underneath "that the above and foregoing is a true copy of the article and receipt thereon written as left by the parties in my possession and with me remaining this 14th day of June, A. D. 1847."   Ross himself was a subscribing witness to the original.   He was living when the ejectment came on for trial.   The jury were called, as appears by the record, October 4th 1847, and the next day the plaintiff suffered a non-suit.   Ross is now dead.   After the most diligent search among his papers, the original is not to be found.

Now it is plain that James Ross, so far as the paper committed to his custody was concerned, was the agent of Valentine Krise for the very purpose of keeping that document.   Not to part with the possession of it unless in obedience to the subpœna of some court, and to furnish a copy when required by either party or any person claiming under them, was also a part of the duty which naturally devolved upon him.   Why shall not his acknowledgment of a paper produced by him as the original when so called on be as good primâ facie evidence of its genuineness as would its production by Valentine Krise himself?   The evidence of John Krise to this acknowledgment of James Ross was positive and unequivocal, and the handwriting of Ross himself to the certificate was clearly proved.   He had no interest to induce him to falsify.   He had upon him the seal of the confidence of the plaintiff himself.   Nor is this evidence, so far as the question of the admissibility of the copy to go to the jury is concerned, at all affected by other evidence calculated to inspire doubts as to whether it was a true copy from the original; such as the loose conversations of the parties going to show that there were other terms and conditions agreed upon not found in the copy; that there were other subscribing witnesses; that in 1844, three years before the copy was made, Ross had said that the original was lost or burned, and that he would have to try and make another one as near like it as he could.   All this went with the copy to the jury, to whom was submitted the question whether upon the whole evidence the copy had been satisfactorily proved to be a true copy of the original.   If one witness deposes positively to the handwriting of a party, whether to a lost or an existing paper, it satisfies the rule.   The paper or copy is admissible, it matters not how many other witnesses may deny it or what circumstances may be proved to cast doubt upon it.   The question of admissibility for the court is always the prima facies; the question of sufficiency remains for the jury.   We think therefore that the court committed no error in admitting the copy for want of sufficient proof of the execution

[Krise *v.* Neason.]

and delivery by the parties of the original agreement, which forms the 1st assignment of error.

As to the 2d and 4th assignments, that the evidence of search for the original was defective, the case of Cauffman *v.* The Presbyterian Congregation of Cedar Spring, 6 Binn. 59, decides that when a written agreement was placed by both the parties in the hands of a common ·friend, who afterwards died, diligent search among his papers is all that is required. There was no evidence that it was ever in the possession of Joshua F. Cox, Esq., or of any other person but Ross.

Nor is the 3d assignment sustained; for, waiving the question whether the mere copy by Ross in performance of a duty, which he had assumed to the parties, would not of itself be sufficient primâ facie evidence that it was a true copy; it was testified by John Krise that the copy had been compared with the alleged original in his presence, he, Krise, holding the copy while Ross read the original aloud. Whether this was the proper mode of making the comparison, and whether it is not necessary that the copy and original should change hands, is a question upon which there is a considerable conflict in the decided cases: Reed *v.* Margison, 1 Campb. 469; Rolf *v.* Dart, 2 Taunt. 52; Gyles *v.* Hill, 1 Campb. 471; McNeel *v.* Perchard, 1 Esp. 264; Fyson *v.* Kemp, 6 Carr. & P. 72; Slane Peerage, 5 Clark & Fin. 24; Harrison *v.* Borwell, 10 Simons 380; Hill *v.* Packard, 5 Wend. 387; Lynde *v.* Judd, 3 Day 499; Starkie on Ev., 9th Am. ed. 271; 1 Greenl. on Ev. § 508. It is unnecessary to discuss the matter here, for it is certainly to be presumed that the trusted custodian of both parties read the original correctly.

We see no error in the charge. The question whether the copy was a true copy was fairly submitted to the jury with such comments on the evidence as the learned judge had an undoubted right to make.

Judgment affirmed.