## SMITH *against* MOORE.

The number on the corner tree under the provisions of the act of the 24th March, 1785, directing the mode of distributing the donation lands, controls the boundaries in the general draught in locating the patent.

THIS was an ejectment for a tract of land situated in French Creek township, Mercer county, containing two hundred acres or thereabouts, bounded by lands of *Robert Cochran,* on the south, *Hugh Moore* and *Samuel Evans,* on the west, by land of *Isaac Woodworth,* and on the north by land on which *Robert Jones* resides.

It was tried in the Circuit Court before Mr. Justice SMITH, and verdict for the plaintiff.

The defendant's counsel moved the court for a new trial—which was refused; from which decision the defendant appealed to the Supreme Court.

The defendant's counsel requested the court to charge the jury—

1st. That the patent is the plaintiff's title.

2d. That his title, if any, is for the land called for in the patent—and must be so far conformed to it as to apply substantially to the land therein described.

3d. That if the land claimed is substantially that given in the patent, the work on the ground, as to the length of lines, courses, &c. is to govern and control: but the land must be that intended in the patent.

4th. That an entirely different tract from that described and intended in the patent, cannot be recovered under that patent.

5th. That the general draft is to decide as to the general relative situation of one tract to another.

6th. That if the plaintiff's survey was made by mistake, or otherwise, on a place entirely different from that called for in his patent —and such survey not returned into office, he cannot recover.

The answers of the court to these points were as follows, viz :

Answer to the first point.—The patent is evidence of the plaintiff's title, but not the only evidence, and in the location of the patent, regard is to be had to the marks on the ground.

Answer to the second.—That the plaintiff's title under the patent is for the tract granted by the patent, and whether the land claimed

(Smith v. Moore.)

in this ejectment is that granted by the patent, is a fact to be decided by the jury from all the evidence given here on the trial.

Answer to the third.—If the land claimed by the plaintiff is that granted by the patent given in evidence, and under which he claims, the marks on the ground are to govern as to courses and distances, and the tract of land must be the same tract drawn and patented.

Answer to the fourth.—The plaintiff in this suit cannot recover an entirely different tract from that drawn and patented to *John M'Ginnis*—but a variation of the courses and distances and boundaries as called for in the patent, from the marks on the ground, will not defeat the plaintiff's title, provided the jury are satisfied from the evidence given on the trial, that the land claimed is the same drawn by and patented to *John M'Ginnis*.

Answer to the fifth.—That the general draft is *prima facie* evidence as to the general relative situation of one tract to another as a general principle—but when the marks on the ground differ from the general draught, the marks on the ground are the true survey; and here it will be observed, that as to the land in dispute, it is admitted by both parties that the general draught is incorrect.

Answer to the sixth.—If the survey under which the plaintiff claims was made by mistake or otherwise on a place entirely different from that called for in the patent, and that survey not returned into the office, he could not recover under the patent, land entirely different from that granted by the patent: but when the survey was made, and whether on the ground in dispute or not, is a matter to be determined by the jury from the evidence given on the trial.

The court charged further upon points submitted by the plaintiff's counsel. 1. That the numbered corner is to control in the locating of the patent. 2. That the declarations of *John Martin* were to weigh with the jury lighter than a feather.

Reasons assigned by defendant's counsel for a new trial.

1st. The charge of the court upon the law was erroneous.

2d. The verdict of the jury was against the weight of the evidence.

3d. The verdict was against both the law and evidence of the case.

4th. The verdict locates the land of the plaintiff in a place entirely different from that described in the patent—or in the survey.

It was argued before all the judges by *Selden* and *Wallace* for the appellant, who referred to 4 *Serg. & Rawle*, 462.

*Banks* and *Baldwin* contra, who cited 2 *Smith*, 62, ib. 290. 4 *Dall. L.* 684. 2 *Bin.* 109. 14 *Serg. & Rawle*, 388. 5 *Bin.* 207. *Pamphl. L.* 1818, 274. 11 *Serg. & Rawle*, 448. 3 *Dall.* 486-7.

The opinion of the court (Tod J. and Huston J. dissenting,) was delivered by

Gibson, C. J.—The legislature undoubtedly contemplated a survey in rectangular figures, because the surveyors were required to mark the number of each lot on the northwestern corner tree of the survey ; a direction which could not well have been executed, had not the lots been laid off in squares or parallelograms corresponding in a degree to the cardinal points of the compass. The lots consequently being alike as regards course, distance, and superficial content; and there being neither warrant nor owner, as in ordinary cases, to answer the purposes of designation, the whole being surveyed together with a view to distribution after the surveys should be returned and connected in a general draught ; it was necessary to have the individual lots distinguished by names or numbers either written on the general draught or marked on objects permanently attached to the lots themselves. The legislature thought proper not to choose between these two methods, but to adopt both; and accordingly the number was directed to be marked on the general draught to serve as a register of the drawing and patenting, and also on a particular corner tree, to identify the subject of the grant. Thus, in the twelfth section of the act of 1785 by which the proceedings were directed, it was provided that " when a sufficient number of lots shall be surveyed and returned to the Surveyor General, he shall cause a draught to be laid down of the whole, noting on each the number thereof; which shall be kept by the Supreme Executive Council till all the applications agreeable to this act shall have been satisfied ; and afterwards shall be safely deposited in the office of the master of the rolls, as a public record, to serve to all intents and purposes in lieu of recording the patents." And by the thirteenth section " the Supreme Executive council shall insert in the general draught and within each lot, the name and rank of the person for whom it was drawn." Thus the office to be performed by the general draught is explicitly told. Then by the tenth section : "In running the boundary lines of the lots, the surveyors, respectively, shall cause the same to be well defined by marking the trees on the lines at small distances, and particularly the angles and corners ; and on the northwestern corner trees, shall be marked in roman figures, the number of the lot ; and if the said corner should be a post, then the said number to be marked on a tree in said lot most contiguous thereto." And from this the office of the numbered corner tree, is equally apparent. The general draught constitutes no part of the title ; and so far were the legislature from meaning to permit it to control the work on the ground, that it was not even evidence of the relative situation of the lots till it was made so by the supplementary act of the 24th of March, 1818 ; and even then, only when the original marks on the ground should not be found. In the order

(Smith *v.* Moore.)

of executing the work directed by the original act, the number was to be marked on the corner tree at the time of running and marking the lines; and, of course, before the draughting of the survey for return. It could not well be marked afterwards, because in making separate returns of each particular survey, the officer would be unable to designate the adjoining lots unless they should already have received their badge of individuality. The general draught was to be still subsequent to the returns. If, then, at the time of making the survey on the ground, the lot received a name of baptism sufficient to distinguish it from all the rest, its individuality could not be destroyed or its name changed by a blunder in the return in respect of the boundaries. Where there is a discrepance between the numbered corner and the boundaries returned, it appears more reasonable that the number should be taken to determine the boundaries, than that the boundaries should be taken to determine the number, which was employed originally to designate the particular lot for no other reason than because the boundaries were inadequate to the task. What certainty of result would there be in locating the particular lot on the spot indicated by the boundaries called for in the return? Many of the numbers called for as adjoining, may be in the predicament of the numbered corner of the lot to be identified, and require previous identification themselves: so that if we once get away from the numbers on the ground, we shall be at sea without star or compass, and with nothing but a chart which is admitted on all hands to be inaccurate. Beside, in very few instances would all the calls in the return be satisfied by any possible juxtaposition; and when but one, or at most two, of the adjoining numbers or trees required, can be made to correspond with the return, what is to be done? By the eleventh section, the surveyor general was required to "give such instructions to his several deputies concerning the numbering of the classes of lots respectively, as that they may succeed each other in numerical order;" and hence it is supposed, that by a numerical process on the general draught, the true place of each number may be perfectly ascertained. That would give to the general draught an importance which I think has been shown the legislature never intended it to have. But having thus fixed the place of the particular number, what if the adjoining numbers should still not happen to correspond with the calls in the return of its survey? Nothing would be gained by the process, the difficulty to be overcome recurring in as great force as ever. That the numerical order of succession was not always observed, either on the ground or in constructing the general draught, is notorious, and hence the frequency of disputes in locating the patent: so that a descrepance between the return of survey and the work on the ground, would occur just as frequently after having determined the location in this way, as if it were determined by the numerals on the corner trees. Beside, to correct a blunder committed at an early

stage of the work, would require the numbers of all the subsequent surveys to be shifted; and thus would be produced a scene of mischief and confusion unparalleled in countries where actual landmarks are regarded. Perhaps in none of the districts, is there a lot, which, having its relative situation thus determined, would correspond with the adjoining numbers as they exist on the ground. The field work would therefore go for absolutely nothing; and all the subsequent work would have to be unravelled in consequence of a single error in the order of succession. This would be ruinous to those who have entered and made improvements according to the numbers as they appear in most instances, not only on the ground, but on the general draught. In the supplementary act of 1818, it is taken for granted that the marks on the ground are to govern. The truth is, this particular part of the original act was merely directory; for it surely never was designed that such a blunder should be fatal to perhaps more than a majority of the surveys. What is the particular difficulty here? It is that if we go by the numbered corner, the trees and adjoining numbers on the ground will not correspond with the return of survey. It is a familiar principle of our system, and one that, in reason, is as applicable to this species of title as any other, that it is the work on the ground and not the diagram returned, which constitutes the survey, the latter being but evidence (and by no means conclusive) of the former. It would be strange, therefore, if a blunder in the return might not be rectified in this instance as in any other, by the work on the ground. It is conceded that the patent may be rectified by the return of survey: and why not the return by the lines on the ground, and particularly the numbered corner tree which is the foundation of the whole? If different corner trees should happen to bear the same number, the returns of survey might be consulted; but surely not where we may go to the source; and for this plain reason, that the return cannot be as satisfactory evidence of the number, as the number itself.

In regard to the argument that the patent passes nothing but what is included in the metes and bounds set out, it is sufficient to remark, that although the prescribed form of the patent requires the bounds to be inserted, yet this is merely for the purpose of description and not to restrict the operation of the instrument. A grant by name or number, where the boundaries have been previously ascertained, passes the whole; and even where the subject-matter is erroneously described, the variance is immaterial where the particular tract can be identified: as in *Stewart* v. *Shoenfelt*, 13 *Serg. & Rawle*, 360, where the land was found to lie in a different township, and *Grant* v. *Eddy*, 2 *Yeates*, 148, where it lay in a different county. The objection would equally hold in respect of any other species of title, where the land marks should include more than the bounds set forth. Were it to prevail here, the soldier would be deprived of the

(Smith *v.* Moore.)

reward of his services altogether. He could not obtain the lot corresponding to the number drawn by him, because it would not be included in the bounds of his patent; and he could not hold the lot actually included, because, not having drawn it, the patent would be void for excess of authority.

The direction of the judge, that the number of the corner tree controls every thing, was therefore an accurate exposition of the law. In arriving at this conclusion it weighs much, that it coincides with the opinion which has been uniformly held in this part of the state by the bench and by the bar, and acted upon by the people. Whatever therefore might be the propriety of it on abstract grounds, it has acquired much of the inviolability of a rule of property, and ought not now to be disturbed.

Judgment affirmed.*

---

* The opinion in this case was delivered at Pittsburgh, October 3, 1829.