# Kennedy et ux. *versus* Lubold.
# Same *versus* Wagoner.

1.  Declarations of a deceased surveyor are strong evidence on a question of boundary, and ought to prevail, unless clearly rebutted by showing either a mistake of the witness in relating the facts or error in the surveyor in making the declaration; and it was error to charge the jury, that such declarations are weak evidence, and by the court hardly believed to be evidence.

2.  Quantity is a circumstance of slight, often of no weight, in a question of title, but it may have a marked effect where the question is one of boundary.  If there be two lines, one corresponding with the quantity of land in the deed, and the other largely in excess, the inference would have weight in determining the true line, especially when strongly asssisted by other evidence. It was therefore error where the question was one of boundary to exclude evidence of the number of acres contained in defendant's claim.

3.  Where the defendant chose to rely on his possession and on a question of boundary, alleging that the plaintiff's survey did not cover the land in dispute, and gave evidence to establish a different northwest corner and a different line, and to dispute the southwest white oak corner, it was directly

[Kennedy v. Lubold.]

rebutting to show that the defendant held under a title, which recognised the corners and line claimed to by the plaintiffs, there being admissions by deed and matter of record; and it was error to charge such evidence was not rebutting evidence.

November 28th 1878.   Before AGNEW, C. J., SHARSWOOD, GORDON, PAXSON and TRUNKEY, JJ.   MERCUR and WOODWARD, JJ., absent.

Error to the Court of Common Pleas of *Crawford county* : Of October and November Term 1878, No. 287.

Ejectment by Thomas B. Kennedy and Arianna S., his wife, against Daniel Lubold and Daniel Wagoner, for thirty acres of land in Wayne township, Crawford county.

Number 1260 was an undrawn donation tract of 200 acres in the sixth district, Wayne township, Crawford county, Pa.   This tract was settled about 1819, by Samuel Evans and Jacob Reese, who resided upon, cultivated and improved the same.   About 1830, Samuel Evans conveyed his interest in the land to Charles Ferris. Jacob Reese, the other settler, has resided upon the tract ever since. About 1835 he also conveyed his interest to Charles Ferris, who employed James Herrington, then deputy-surveyor for the county, to examine the lines and survey the tract in question.   The surveyor commenced at the southwest corner, a white oak, blocked it, and pronounced it the original donation corner; proceeded thence to the northwest corner, a hickory, blocked it also, and pronounced it the original numbered donation corner; and thence around the tract to the beginning, finding each of the four original corners. Mr. Ferris then applied for a warrant for an official survey of the tract.   This warrant was directed to Ebenezer Felton, then deputy-surveyor, who went to the land with Charles Ferris, the owner, on the 14th of September 1838; examined the several corners previously blocked by Herrington, and found them correct; made a draft and return of his survey to the office, upon which he recited the white oak the southwest, and the hickory the northwest corner of the tract, and the whole tract containing 219 acres, 111 perches and allowance of six per cent. for roads.   Mr. Ferris having paid the purchase-money to the Commonwealth, a warrant of acceptance issued from the land office on the 13th day July 1841, and same day patent issued to him for the same.

October 16th 1841, Charles Ferris and wife conveyed the north part of said tract of land, which was unseated and uncultivated, to John Stewart Riddle.   About the same time he conveyed the south part of the land to Jacob Reese, the settler, and to Adam Peters. This was the part of the tract upon which the improvement had been made.   The dwelling-house of Reese, where he has lived for nearly sixty years, is within twenty-five or thirty rods of the southwest corner of the tract.   Mr. Riddle paid the taxes upon this land,

which was unseated, until his death, in 1850.   On the 10th day of November 1852, this land was sold by the treasurer of Crawford county for the taxes of 1850–1, to Darwin A. Finney, who, on the 29th day of August 1859, conveyed the same to Arianna S. Kennedy, only daughter and heir-at-law of John Stewart Riddle, and the plaintiff in this case.

The north part of tract 121 adjoining 1260 on the west was unseated, and sold by the treasurer of Crawford county to the commissioners October 18th 1838, for the taxes of 1837–8.   The commissioners paid the taxes on the land until May 1848, when they conveyed the same to Franklin Stratton, who died intestate about 1860.   Upon a partition of his estate in the Orphans' Court in 1866, this 100 acres, the north part of 121, was awarded to his daughter, Adelaide Stratton, and his widow, Caroline Stratton, who in April 1869, conveyed the same to Daniel Lubold, the defendant in this case.   The survey and diagram under the partition in the Orphans' Court made the eastern boundary of the same, the line as claimed by the plaintiffs in this case, from the hickory, the northwest corner of 1260, to the white oak, the southwest corner of same tract, and the same corner and the same place upon the ground where the plaintiffs · claim the same are now and have been since 1785.

On the trial of this case below the plaintiffs gave in evidence the certified draft of the donation surveys of the sixth district, which showed that No. 1260 was an undrawn lot.   The official survey under the settlement and improvement of Samuel Evans and Jacob Reese in 1838, which survey recited the same boundaries as given in the donation survey of 1785, and found the same to contain 219 acres, 111 perches, and allowance of six per cent.   Then the patent for the whole tract to Charles Ferris, dated 13th of July 1841; this was followed by evidence of the surveyor, who proved that the land described in the writ given in evidence was contained within the boundaries of the tract, and constituted the northwest portions thereof, and that the same was unseated.   The court, at the request of the defendants' counsel, required the jury to be sworn in another action of ejectment by the same plaintiffs, against Daniel Wagoner, for the southwest part of 1231 adjoining the land in dispute in the Lubold case upon the north.   Plaintiffs then gave in evidence the legal title to the whole of tract No. 1231.

This was a donation tract drawn by Richard Wills, private, and surveyed November 25th 1785, and situated directly north of No. 1260.

John Stewart Riddle acquired title to this tract about 1830, and continued to pay the taxes thereon until his death, and afterwards these were paid by his heir-at-law until about 1860, when the whole tract was sold by the treasurer of Crawford county for the taxes of 1858–9, and the same conveyed by the purchaser to the plaintiffs

in this case in June 1866; since which time the taxes have been regularly paid by the plaintiffs.

In 1871 the plaintiffs in this case brought an action of trespass against Daniel Wagoner, the defendant, for cutting timber trees upon the same land now in dispute in this action of ejectment. The defendants pleaded "Not guilty," and the case came on for trial in December 1875. After the plaintiff's testimony was concluded, the court directed a nonsuit, on the ground that the possession of the land being disputed, the plaintiffs must first determine their title by an action of ejectment. A writ of error was taken by the plaintiffs to No. 20, of October and November Term 1876, and heard in this court in November 1876, and the judgment affirmed.

December 4th 1876, this action of ejectment was brought in accordance with the rulings of the court in the action of trespass.

Plaintiffs also read in evidence the deposition of Jacob Reese, as to his settlement and residence upon tract 1260, and as to the white oak, the southwest corner, and the butternut at or near the southeast corner of the tract, and that these original corners had never been disputed.

Plaintiffs also read in evidence the deposition of Charles Ferris, the patentee, who testified, inter alia, that he was on the land in question in 1837–8, while the original donation marks were plainly to be seen; that the deputy-surveyors, while on the ground and in his presence, blocked the corner trees, and especially the hickory, the northwest corner, and found the numbers therein and pronounced the hickory at the northwest corner and the white oak at the southwest corner to be the original donation corners.

The plaintiffs also introduced the testimony of A. W. Mumford, Henry B. Beatty, Judge Van Horne and F. R. Young, each of them surveyors of long experience in Crawford county, and especially on donation lines, and each of them testified that in their judgment, the hickory, as claimed by the plaintiffs, was the original corner of tract 1260.

Plaintiff also proved by a number of witnesses, that Jacob Reese, the settler on the tract, and Adam Peters, the settler, and for many years resident of tract 1266, lying directly south of 1260, always claimed the white oak at the intersection of the roads was claimed by the plaintiffs to be the original corner of their respective tracts; also proved by ancient deeds that the northeast corner of tract 1302 was the Reese white oak, and by other deeds for the southeast part of tract 121 was the Reese white oak.

It was the theory of the artists, supported by the marks upon the donation surveys, that the donation surveyors actually ran only the east and west lines of the tracts, running the north and south only in cases where they would pass from one block to another; that upon the original survey of the land in question, the artists had commenced near the eastern boundary of the district, marking

[Kennedy v. Lubold.]

No. 1256, thence west 1257, 1258, 1259 and 1260, and stopped; tract No. 1261 not found in the district.

Again, in surveying the tract next west of 1260, the artists had commenced near the western boundary of the district, at No. 114, thence east to 115, 116, 117, 118, 119, 120 and 121, and from the numbered corner of 121 they ran north and made 122, thence west again, completing a block of thirteen 250-acre tracts. It was clear that the donation surveyors did not run the line between the northwest corner of 121 and northwest corner of 1260, but simply plotted the same.

The defendants gave no evidence of title to the land in dispute, but gave testimony of one surveyor, that he had found marks on a tree on the north line of 1260, and fifty-six rods east of the hickory, which, upon counting the growths over these marks, they would correspond in date with the donation survey in 1785. Also evidence of some marked trees north and south from this, but of much later dates. Also proved by one witness that some forty years since, some parties had claimed a tree forty rods east of the Reese white oak as the southwest corner of 1260. The land was cleared about that time, and has been under cultivation ever since, the owner of the land on either side always maintaining that the real corner was where the stump of the numbered corner-tree now lies, at the intersection of two well-known public highways.

During the progress of the trial before Church, P. J., George Long, a surveyor, defendants' witness, being on the stand, and having answered a question as to the length of Lubold's lines north and south, east and west, the plaintiffs proposed, on cross-examination, to ask witness the further question how many acres there were in the Lubold tract, to which question the defendants objected on the ground of its irrelevancy, which objection the court sustained. First assignment of error.

The second assignment of error was in admitting defendants' evidence as to survey of Samuel Evans, which evidence was as follows: "In pursuance of Samuel Evans' actual settlement, was surveyed June 14th 1819, the foregoing tract of land, containing 200 acres, and an allowance of six per cent. for roads, &c., it being lot No. 1260, in the Sixth District of Donation Land, situated in Wayne township, Crawford county, Pa. The plot is marked N. W., N. E., and S. E. corner, post, and the southwest corner an Elm, and containing 200 acres." The foregoing evidence was objected to by plaintiffs, and the objection overruled by the court, who said, "We will admit the evidence for the purpose of showing what the surveyors in 1819 found on that undrawn tract, the corners and the boundaries."

The third assignment was in rejecting the deed of Caroline Stratton and Adelaide Stratton to Daniel H. Lubold, the defend-

[Kennedy v. Lubold.]

ant, for 100 acres of land adjoining plaintiffs on the west, and for the purpose of showing that the survey of defendant's land was made to the line plaintiffs claim to, and that the line plaintiffs claim to was the line conveyed to defendant by them, to rebut the defendant's evidence as to the place of the true original line of tracts in these cases.

The court rejected this evidence on the ground that it was not in rebuttal, and that the plaintiff must maintain his right upon the strength of his own title, and not upon the weakness of the defendants.

The fourth assignment was in rejecting for like reasons the proceedings in partition of the real estate of Franklin Stratton, deceased, at No. 33, August Term 1866, of the Orphans' Court of Crawford county, in which one of the purparts of the estate was the north part of No. 121, adjoining plaintiffs' land on the west, and was subsequently conveyed by the heirs of Franklin Stratton to the defendant, and under which he claims title in this case, to show the complete survey of the Daniel Lubold land, and to show that the line they surveyed, and claimed to, was the line from the white oak to the hickory, as shown by plaintiffs, and to rebut the defendants' evidence, and show that this purpart did not reach to the east line, to which Lubold now claims, and to rebut the evidence in relation to the place of that alleged line.

The fifth assignment was in rejecting for like reasons the deed of John Reynolds to Daniel Wagoner, defendant, for the southeast part of No. 122, to show that the southeast corner of his land, to which he claims title here, was a post, and so stated in his deed, and to prove that post is a good way west of where they have this alleged corner, and to show there has been no claim in the record title to the land reaching east of the hickory, and to rebut the defendants' evidence as to line east of the hickory claimed by plaintiffs.

The following portions of the charge in brackets constituted respectively the assignments of error from the sixth to the twelfth inclusive:

" It is for you to determine the true west line of 1260 and 1231, and the east line of 121 and 122. As has been well said, there is not enough land there upon the ground to satisfy the draft made by the surveying parties when they got through. Because 121 would have to be, and is so marked by the draft from which I am reading, one hundred and sixty-two and a half perches east and west. According to the situation of the plaintiffs' claims, as they are confined to the Lubold tract, 121 has not enough perches. If the theory of the plaintiffs is correct, there is not enough land in the latter tract by forty perches. Upon the other hand there is not enough in 1260; 1260 was surveyed one hundred and thirty-seven perches. According to the theory of this defendant, the Kennedy tract has only

[Kennedy *v.* Lubold.]

eighty-six perches east and west ;. there is not enough land to satisfy the distance made upon paper, showing that the surveyors in that early day didn't survey with precision these tracts of land. They took something for granted, or else were very negligent in the manner in which they did their duty, in making these mistakes.

[" You will bear in mind, that although it is supposed in 1785 to be an undrawn tract, this plaintiff claims title, by virtue of a survey and warrant of acceptance to the tract made in 1838. Mr. Herrington made this survey in 1838. There is no doubt, if you believe the testimony, but what he did go to the northwest corner of 1260, presumably to that hickory. The northwest corner purports to be a hickory. The blazes and marks upon that hickory, by Mr. Long's count, were about thirty-nine growths upon that since the last marks were made, which would make it about 1838, or about forty years. There is no doubt but that the surveyor, Herrington, did go to that hickory. Whether he did right in going there, or whether it had not been surveyed with 122 and 1231, or it had been an encroachment upon the northeast corner of 121, is for you to determine. These are precisely the points for your investigation.]

[" Evidence has been given you of the southwest corner, the Reese white oak stump. Evidence has been given you that that was a white oak, well understood by parties in an early day; and since that time it was the line or corner. It has fallen away, or else because it was standing in the corner of the two roads, it has become open to the public and worn away. The old gentleman upon the stand tells us that Reese always claimed to that as a corner. Upon that the parties in possession of 121 claimed to that other white oak, about forty perches east. The testimony, however, is for you. From all we can learn from the testimony given upon the part of both plaintiffs and defendants, one white oak is forty rods east of the other. The same contention was had in 1834 and 1840 ; the same contention by the then owners upon each side of those two white oaks, that there is now ; Peters and Reese claiming the furthest west white oak, the one the present plaintiff claims to ; and others claiming forty rods east, of whom Shafer and Evans were two. Their declarations have been given in evidence. We allowed those to be given in evidence, because the declarations of a party in possession of a piece of property are always evidence to show what his claims are, where he claims or pretends to go.]

[" So far as that white oak is concerned, we are just as bad off at this trial as the parties to this contention were thirty-five or forty years ago. So you will have to determine as best you can. That is for the jury to determine. There has been a contention about that land, we don't know how long. Lubold and Wagoner have been in possession there, and claim just what their predecessors claimed. Mr. Long gave evidence and Klinger also. If it was in contention such as testified to by Klinger and the other witnesses;

[Kennedy *v.* Lubold ]

they have bought it out.  At all events, there has been no litigation that we know of.]

" At the northwest corner of 121, Squire Long found marked upon a tree CXXI; that is an undisputed corner.  Upon the northeast corner of 1260; that is an undisputed corner.  There seems to be no doubt about the antiquity of both those corners. Then, the northwest corner of 1231, which is called interchangeably an ash, poplar and chestnut; that seems to be an original corner; the ash being the corner, and the chestnut and poplar being simply witnesses or indexes to it.  Those corners have been admitted to be true.

[" Now, Mr. Long testifies, and he is an old surveyor, and entitled to your consideration, so far as his manner of testifying and knowledge of what he testifies is concerned—he was upon the ground, and as such he is entitled to your consideration as much as any of the other surveyors.  He says at a place where it is simply marked as a cranberry marsh he saw marks that were original.  He says it was an original corner.  He says it was the original northeast corner of 121, and, of course, the true northwest corner of 1260.  He saw the marks there, and in 1869 they counted eighty-two years. If you find that to be true, that is certainly very strong evidence of that corner being an original donation corner of the donation surveys made in 1785.  This survey was made in December 1785. Of course there would be a cut place for that year, but no growth for that year.  It would be 1786 before it would have a growth.  There would be only fourteen years in the last century.  In 1869 he cut that off, in May, before the growth came.  That would make sixty-eight in the present and fourteen years in the last century.  That would be eighty-two growths, or eighty-two years since that was cut. If you believe his evidence, if you believe he cut and counted correctly, if that be true, it is strong evidence that the white oak near the cranberry marsh, to which Lubold and Wagoner claim, was the donation corner made in 1785.  Hence, Herrington, in 1838, no matter whether he did go over to the hickory, which is some forty or fifty rods west of the white oak, where defendants claim, had no right to go there, because it had already been surveyed off, and tracts 1231 and 1260 must put up with it.]

[" There is evidence of what Herrington or some surveyor said when he went to this tract corner.  That is hearsay evidence, and we admitted that with a good deal of reluctance.  We hardly believe it is evidence.  We say to you in determining that evidence, it is weak evidence.  It is not as strong evidence as that of witnesses who come here upon the witness stand and submit to cross-examination, in testifying to what is the true corner from the very necessity of the case.  We submit it to you to take into consideration.  In 1838, Herrington and Ferris, going there with just a mere contention of his own, without any one to gainsay him, what

[Kennedy *v.* Lubold.]

he said thirty-nine years ago, is testified to now by witnesses who say they heard him so state. We say his opinion is weaker than the testimony of Long, Mumford and Beatty, who came upon the stand and gave testimony of what they saw in later years. You will recollect Mr. Long found other marks upon the north and south line. Running on the line from the white oak, he found post and stones, the chestnut, and marks upon them, some of which he counted, and they counted fifty, forty, thirty and so on; showing they were made by some one going through there without much authority. Whether they were made by surveyors, wood-choppers or hunters, we don't know. At all events, we find these marks, and you have the evidence as to whether they were original marks, or bear evidence of originality."]

["We cannot assist you any further in this case than we have done. Bear in mind the northwest corner of 1231 is undisputed, the southeast corner of 1231 is undisputed, and the northwest corner of 121 is undisputed. From that to the disputed corner where this plaintiff seeks to recover is 137 perches. Instead of having 162 perches, as he would, if the line runs clear across the tract, if that be correct, he would have only 137, provided he did not encroach upon the other tracts. Bear in mind these donation surveys were made at different times. 1260 was surveyed the 6th of December 1785, and 1231 was surveyed the 4th of December 1785. If one overlapped the other, the older survey is to govern. Bear in mind what is said as to the two white oaks. That corner of 1260 was disputed thirty or forty years ago; the same dispute thirty or forty years ago as now.]

["Bear in mind what we said to you in the outset, the plaintiff must recover upon the strength of his own title. In other words, he must satisfy you that the west lines of 1231 and of 1260 are of the donation surveys of 1785, as he claims them. Unless he has done that he is not entitled to recover. Whether Lubold and Wagoner own it or not, they can have it for the present. They have a right to maintain their possession by showing that any one in the world except Kennedy owns the land."]

The verdict was for defendants, and plaintiffs took this writ, their assignments of error being those above noted.

*Joshua Douglass,* for plaintiffs in error.—The evidence in rebuttal should have been admitted: Sidle *v.* Walters, 5 Watts 389; Cutbush *v.* Gilbert, 4 S. & R. 551; Richardson *v.* Stewart, 4 Binn. 198.

The proceeding and survey of the land under the authority of the Orphans' Court, and in presence of the parties in interest, and the deed of the heirs in pursuance and ratification of the proceedings in partition, and the boundaries therein established, and the deed of John Reynolds to defendant, Wagoner, for the southeast

[Kennedy v. Lubold.]

part of tract No. 122, showing the eastern boundary thereof, were the solemn declarations of the parties under whom the defendants each held, and such declarations are clearly evidence, and should have been admitted by the court: Grubb v. Grubb et al., 24 P. F. Smith 25; Whart. Law Ev. 1156; Dawson v. Mills, 8 Casey 302; Allen v. Allen et al., 9 Wright 468; Gratz v. Beates et al., 9 Id. 495.

The declarations of deceased persons made on the ground are competent evidence, and should be received: Caufman v. Cedar Springs, 6 Binn. 59; Hamilton v. Menor, 2 S. & R. 70; Buchanan v. Moore, 10 Id. 275; Commonwealth v. Philadelphia, 4 Harris 79; Bender v. Pitzer, 3 Casey 334; McCausland v. Fleming, 13 P. F. Smith 36; 1 Whart. Law Ev. 191 and notes; Nieman v. Ward, 1 W. & S. 68.

*Wm. R. Bole* and *D. M. Farrelly*, for defendants in error.

Chief Justice AGNEW delivered the opinion of the court, January 6th 1879.

These two cases were argued together. They seem to have been tried upon the doctrine of leaving first principles and going on to perfection. But old surveys are not to be so tested. Most perfect in the beginning they are constantly undergoing change and decay, until by wind, fire, rottenness, and the acts and frauds of men, their evidences lie only in memory and hearsay. Hence when the learned judge said of the acts of the surveyors, who forty years before went upon the ground, ran the lines, blocked the trees, counted the growths, found original marks, and pronounced the hickory the numbered corner of donation lot No. 1260, it was mere hearsay, he hardly believed it evidence, admitted it with reluctance, and it was weak evidence in determining, he clearly misled the jury. The reverse is true—the evidence was strong, and ought to prevail unless clearly rebutted, by showing either a mistake of the witness relating the facts, or error in the surveyors making the declaration that the hickory was the numbered corner and the white oak opposite an original corner. Herrington in 1837, and Fenton in 1838, were engaged in professional acts, the latter locating the warrant officially, and under his oath of office. The declarations as to the corners when found, blocked and counted, were a part of the *res gesta*, and so far from being doubtful evidence were competent and always admitted when the transaction is old and the surveyor dead: Nieman v. Ward, 1 W. & S. 68; Caufman v. Congregation, 6 Binn. 59; Hamilton v. Meanor, 2 S. & R. 70; Buchanan v. Moore, 10 Id. 275; Dawson v. Mills, 8 Casey 302; Gratz v. Beates, 9 Wright 495. The case of Bender v. Pitzer, 3 Casey 333, was one of different character, and the language of Judge Knox inapplicable to this.

There was also an inaccuracy in the judge's reference to Long's

[Kennedy *v.* Lubold.]

testimony. He remarked, " Long says it was an original corner. He says it was the original northeast corner of 121, and of course the true northwest corner of 1260." There were two inaccuracies in this statement liable to mislead. And first, Long found no hickory, either marked or not marked, not even the remains of one, but he found a white oak blazed on the north and south sides, with one mark each. He said he would call it an index tree (that which surveyors usually call a pointer). But he found what would be only the evidence of a line running north and south, and not a marked corner or its pointer. He might think the hickory or northwest or numbered corner of No. 1260 once stood near, but this would be opinion only, and he did not say, as the learned judge inferred and told the jury, to wit: "He says it was an original corner." A second and more hurtful inaccuracy was the statement that being the original northeast corner of No. 121, it was, of course, the *true* northwest corner of No. 1260. This might be so if the corners were identical, but it was not necessarily, and the statement conveyed the impression that the numbered corner (the northwest) was subordinate to the northeast corner of its adjoiner.

The settled doctrine of the donation moneys is that the numbered corner is the ear-mark of the tract to which it belongs, and controls all the other marks on the ground: Smith *v.* Moore, 5 Rawle 348; Dunn *v.* Ralyea, 6 W. & S. 475; Greely *v.* Thomas, 6 P. F. Smith 35. This doctrine follows the direction of the Act of 24th March 1785, 3 Sm. Laws 292, that " on the northwestern corner thereof each lot shall be marked in Roman figures the number of the lot, and if the said corner should be a post, then the said number to be marked on a tree in said lot most contiguous thereto." The act also directed that the lots should succeed each other in numerical order, and a draft of the whole be made, noting the numbers on each, and that the draft should stand in lieu of recording the patents which were directed to be noted on the drawn number thereon. Hence Chief Justice GIBSON said, in Smith *v.* Moore, *supra*, " the lot having received a name of baptism to distinguish it from all the rest, its individuality could not be destroyed or its name changed by a blunder in the return, and when there is a discrepance between the numbered corner and the boundaries returned, the former must govern." For the same reason it was held, in Dunn *v.* Ralyea, *supra*, that No. 1031, found marked on the ground out of order, and where No. 1029 was called for on the general draft, must prevail over No. 1028. If, therefore, the numbered hickory seen by Herrington and Fenton in 1837 and 1838, was the true numbered northwest corner of 1260, the judge erred in saying that the white oak proved by Long as the northeast corner of No. 121, was the true northwest corner of No. 1260.

The learned judge also fell into error in refusing evidence of the number of acres contained in defendant's claim. He claimed a

[Kennedy v. Lubold.]

corner as the northeast corner of his tract, fifty-six perches east of the hickory. This would make a very large difference in the area or quantity of his land. Quantity is a circumstance of slight, often of no weight in a question of title, but it may have a marked effect where the question is one of boundary. If there be two lines, one corresponding with the quantity of land in the deed, and the other largely in excess, the inference would have weight in determining the true line, especially when strongly assisted by other evidence.

He erred also in rejecting the rebutting evidence contained in the third, fourth and fifth specifications. These offers of the deed from the Strattons to Lubold, the proceedings in partition of J. Stratton's real estate, and the deed from Reynolds to Wagoner, were for the purpose of showing that the defendants in their own title recognised the boundary claimed by the plaintiffs to be theirs. This was both rebutting and strong evidence. It was rebutting, for when the plaintiffs had exhibited their survey, warrant of acceptance and patent, and proved that the survey applied to the land in controversy by the metes and marks on the ground, they had shown a good title to recover. What defence would be made to this was not to be anticipated as a matter of law. Whether the defendant would rely on an adverse title, or on possession alone, or on a question of boundary, the defence he would set up alone could show. He chose to rely on his possession and on a question of boundary, alleging that the plaintiffs' survey did not cover the land in dispute. Hence when the defendants gave evidence to establish a different northwest corner and a different line, and to dispute the southwest white oak corner, it was directly rebutting to show that the defendants held under a title which recognised the corners and line claimed to by the plaintiffs, these being admissions by deed and matter of record, which the late Chief Justice Thompson thus characterized : " It is always proper in controversies involving lines, corners and boundaries of land, to receive in evidence what the owner may have said about them while owner. So, on the same principle, are deeds and articles of agreement, executed by such owner, recognising particular lines, corners or monuments as boundaries, evidence. Sometimes such acts are admissions only, and at others they may arise to the consequence of estoppels *in pais;* but as either they are evidence." Now, in the present case, the proceedings in partition and the deeds not only recognised the western boundary of Riddle's land—No. 1260—as a common boundary, but the public road as the western boundary of No. 121. The distance eastward was also stated, and the lands of Wentworth and Risinger on the south, and of Demmington and Wagoner on the north, were called for as adjoiners. Clearly this was competent evidence to go to the jury to show, if it did so, that the defendants had recognised and bounded themselves by the line of 1260, as claimed by the plaintiffs.

7 Norris—17

[Kennedy *v.* Lubold.]

These are the only assignments of error we deem ıt necessary to notice; but for these the judgment must be reversed.

˥udgment reversed, and a *venire facias de novo* awarded in each case.